The defendants, William Millette, Ted Millette, and Thomas Millette, appeal from a judgment based on a jury verdict in favor of the plaintiff, O'Neal Steel, in an action to enforce a guaranty agreement. The issues before us are 1) whether the trial court had in personam jurisdiction over the nonresident defendants, Ted Millette and William Millette; and 2) whether the trial court erred in finding that O'Neal's use of its peremptory strikes in jury selection was not racially discriminatory and therefore did not violate Batson v.Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986),Edmonson v. Leesville Concrete Co., ___ U.S. ___,111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), and Thomas v. DiversifiedContractors, Inc., 551 So.2d 343 (Ala. 1989).
The Millettes owned Fabricators, Inc., a corporation with its principal place of business in Pascagoula, Mississippi. The Millettes are residents of Mississippi. O'Neal Steel is a Delaware corporation with its headquarters and principal place of business in Birmingham, Alabama. O'Neal sold steel and steel products to Fabricators, Inc. As a condition for extending a line of credit to Fabricators, O'Neal required the Millettes to execute an agreement guaranteeing the payment of the debt of Fabricators to O'Neal. The Millettes executed the agreement in Pascagoula, Mississippi, on July 31, 1980. The agreement was later modified by letters sent from O'Neal in Birmingham, Alabama, to Fabricators on March 15, 1982, and August 11, 1982. Before *Page 1227 
August modification, Thomas Millette and two other representatives of Fabricators met in Birmingham with representatives of O'Neal in order to discuss an increase in Fabricators' line of credit. This case arose from a dispute over the application of the March and August modifications.
Before answering O'Neal's complaint, the Millettes filed a motion to dismiss, alleging a lack of personal jurisdiction, but the trial court overruled the motion. Following discovery, the case proceeded to jury selection. After some prospective jurors were excused for cause, the venire from which the jury was selected consisted of 24 persons, of whom 6 were black. Each party was allowed 6 peremptory strikes. O'Neal used its first 4 peremptory challenges to eliminate blacks from the venire. A jury of 10 whites and 2 blacks was empaneled. After jury selection, the Millettes moved for a mistrial on the basis that O'Neal had improperly used the peremptory strikes in violation of the Equal Protection Clause and Batson. Without explicitly finding that the Millettes had established a prima facie case under Ex parte Branch, 526 So.2d 609, 625
(Ala. 1987), the trial court directed O'Neal to state its reasons for striking the black veniremembers.
O'Neal's counsel said to the court that he believed that it was important for the success of O'Neal's case that jury members be able to understand written contracts, modifications, and the written language, because, he said, the case hinged on the interpretation of written agreements.
With regard to each black veniremember that he struck, O'Neal's counsel gave explanations that will be subsequently addressed. O'Neal's counsel did not, however, ask any questions on voir dire regarding the veniremembers' educational background.
At the conclusion of this hearing, the trial court overruled the Millettes' motion, and the case proceeded to trial. After O'Neal had presented its case in chief, the Millettes renewed their motion for a mistrial; the trial court again overruled the motion. After the jury returned a verdict in favor of O'Neal against the Millettes, the Millettes filed a motion for new trial, again asserting a lack of personal jurisdiction over Ted and William Millette and discriminatory use of peremptory challenges to remove blacks from the jury. The motion was overruled, and the Millettes now appeal from the judgment for O'Neal.
Ted and William Millette's first contention is that they did not have contacts with the State of Alabama sufficient for the Jefferson Circuit Court to exercise personal jurisdiction over them. Our task is to determine whether, in this case, inpersonam jurisdiction exists in an Alabama court via Alabama's long-arm rule. Rule 4.2(a)(2), A.R.Civ.P., sets out the bases for personal jurisdiction over nonresident defendants. It provides in relevant part:
 "(2) Sufficient Contacts. A person has sufficient contacts with the state when that person, acting directly or by agent, is or may be legally responsible as a consequence of that person's
". . . .
 "(I) otherwise having some minimum contacts with this state and, under the circumstances, it is fair and reasonable to require the person to come to this state to defend an action. The minimum contacts referred to in this subdivision (I) shall be deemed sufficient, notwithstanding a failure to satisfy the requirement of subdivisions (A)-(H) of this subsection (2), so long as the prosecution of the action against a person in this state is not inconsistent with the constitution of this state or the Constitution of the United States."[1]
Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228,2 L.Ed.2d 1283 (1958), requires that a nonresident defendant have certain minimum contacts with a state in order for that state's courts to acquire personal jurisdiction over that defendant. InKeelean v. Central Bank of the South, *Page 1228 544 So.2d 153 (Ala. 1989), this Court set out a twofold analysis used in this state in determining whether an Alabama court can exercise personal jurisdiction over a nonresident defendant:
 "1) the determination of whether it is foreseeable to that nonresident defendant that he will be sued in this state; and
 "2) the determination of the degree of contact that the nonresident defendant has with this state."
Keelean, 544 So.2d at 156, citing Alabama Waterproofing Co. v.Hanby, 431 So.2d 141 (Ala. 1983); Duke v. Young, 496 So.2d 37
(Ala. 1986); and Shrout v. Thorsen, 470 So.2d 1222 (Ala. 1985).
In Keelean, Central Bank was asked to lend money to a Florida corporation, Holdco. As a prerequisite for lending money to Holdco, Central required several individuals to sign a guaranty agreement. In that case we noted that it appeared that all of the guarantors were aware that they were guaranteeing payment of the debts of a Florida corporation that was borrowing $4,000,000 from an Alabama corporation. We concluded: "It is quite foreseeable that upon the default of that loan, they would be held accountable on their contracts of guaranty in the State of Alabama." Keelean, 544 So.2d at 157.
The Millettes argue that it was not foreseeable that they would be haled into the courts of Alabama. In support of this contention they point out that Ted and William Millette never traveled to Alabama during their negotiations with O'Neal. Rather, negotiations between Ted and William Millette and O'Neal took place in Pascagoula, Mississippi. There is no dispute that the guaranty agreement was signed in Mississippi.
Although O'Neal is a Delaware corporation, its principal place of business and its corporate headquarters are in Birmingham, Alabama. The credit office, from which the line of credit and both of its modifications were approved, is located in Birmingham, Alabama. In fact, O'Neal required Thomas Millette and other representatives of Fabricators to travel to Birmingham to discuss a modification of the credit agreement.
It appears that the Millettes knew that they were guaranteeing the debts of Fabricators and knew that Fabricators was purchasing steel on credit from a corporation located in Birmingham, Alabama. It, therefore, is foreseeable that upon a default by Fabricators, O'Neal would hold the Millettes accountable on the guaranty in the State of Alabama.
The Millettes attempt to distinguish our analysis inKeelean by pointing out that while Central Bank is an Alabama corporation, O'Neal is incorporated in Delaware. We hold that when the plaintiff corporation has its headquarters and principal place of business in Alabama, the state from which it received its corporate charter is irrelevant in the application of our long-arm rule.
Ted and William Millette further argue that the "degree of contact" prong of our test is not satisfied because, they say, they had no contact with O'Neal in Alabama before the execution of the guaranty agreement. Without duplicating here our opinion in Keelean, we hold, applying the "effects test" mandated byCalder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804
(1984); Alabama Waterproofing; and Duke v. Young, that the Millettes should have foreseen the effects of their guaranty in the State of Alabama in the event of a default by Fabricators. Moreover, the signing of the guaranty and the negotiation of its modifications gave the Millettes the fair notice required by Burger King Co. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174,85 L.Ed.2d 528 (1985). In order for the courts of Alabama to exercise in personam jurisdiction over a nonresident defendant, it is not necessary that he actually have any physical presence in Alabama, so long as his conduct is such that he should foresee that his actions would have effects in this state.
We hold, therefore, that by their conduct in negotiating the line of credit, executing the guaranty, and negotiating its modification, Ted and William Millette had contact *Page 1229 
with this state sufficient to meet the requirements of the 14th Amendment to the United States Constitution, so that the Alabama court had in personam jurisdiction pursuant to Rule 4.2(a)(2)(I).
We now turn to the issue of whether O'Neal's use of its peremptory strikes to eliminate black veniremembers violated the prohibitions of Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Thomas v. DiversifiedContractors, Inc., 551 So.2d 343 (Ala. 1989). In Thomas, this Court adopted both the reasoning and the result in Fludd v.Dykes, 863 F.2d 822, reh'g denied, 873 F.2d 300 (11th Cir. 1989), cert. denied, 493 U.S. 872, 110 S.Ct. 201,107 L.Ed.2d 154 (1989), and held that the Batson principle was applicable in both criminal and civil cases. 551 So.2d at 345.See also, Edmonson v. Leesville Concrete Co., ___ U.S. ___,111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). In Powers v. Ohio, 499 U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the United States Supreme Court held that white litigants, as well as black litigants, have standing to challenge the discriminatory exclusion of blacks from the jury venire.
The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination. Ex parte Branch,526 So.2d 609, 622 (Ala. 1987). After a prima facie case has been established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Exparte Branch, 526 So.2d at 623. The responding party then has the burden of articulating a clear, specific, and legitimate reason for the challenge that relates to the particular case to be tried and that is nondiscriminatory. Ex parte Bird,594 So.2d 676, 679 (Ala. 1991), quoting Batson, 476 U.S. at 97,106 S.Ct. at 1723, 90 L.Ed.2d at 88. Once the responding party has articulated a nondiscriminatory reason or explanation for challenging the black jurors, the defendant can offer evidence showing that the reason or explanation is merely a sham or a pretext. Ex parte Branch, 526 So.2d at 624. When the trial court has followed this procedure, its determination will be overturned only if that determination is clearly erroneous. Exparte Branch, 526 So.2d at 625.
In reviewing a decision of the Court of Criminal Appeals, we held that
 "the reviewing court's inquiry, whether the [challenged party's] explanations are offered voluntarily or by order of the trial judge, shall not be restricted by the mutable and often overlapping boundaries inherent within a Batson-analysis framework, but, rather, shall focus solely upon the 'propriety of the ultimate finding of discrimination vel non.' "
Huntley v. State, [Ms. 1910530, September 18, 1992], 1992 WL 228152 (Ala. 1992). Moreover, in this case, O'Neal does not assert that the Millettes failed to make a prima facie showing of Batson discrimination. Accordingly, we will review the relevant portions of the record in determining whether the trial court's ultimate determination that the reasons given for the strikes were race-neutral was clearly erroneous.[2]
O'Neal's counsel presented the following explanations for its strikes of black veniremembers:
 Veniremember 258: "She was a nurse at Carraway [Methodist Hospital], and you know, Cabaniss, Johnston [a Birmingham law firm] represents Carraway and I struck her because I have had some bad experiences before in juries with nurses. Nurses tend to be very, very sympathetic and I struck her for that reason."
 Veniremember 198: "She was a school teacher, but if you noticed, she answered two questions with sentences that did not have verbs in them." *Page 1230 
 Veniremember 192: "She is in patient services at UAB [the hospital of the University of Alabama at Birmingham] and she did not appear to have a high level of education."
 Veniremember 186: (Employed at Fair Haven Retirement Home) "Her husband is permanently disabled. . . . There again, it did not appear that she had a job that would be consistent or would derive from a high level of education."
We first hold that with regard to veniremember 258, the trial court's determination was not clearly erroneous. In Bass v.State, 585 So.2d 225, 237 (Ala.Crim.App. 1991), the Court of Criminal Appeals held that the prosecutor presented a race-neutral reason where a black veniremember was struck because "she was a nurse and indicated that she had a relative who had had a nervous breakdown" and insanity was a potential defense in the case being tried.
In this case, veniremember 258 was employed by Carraway Methodist Hospital, and O'Neal's counsel had formerly been employed by the law firm that represents Carraway Methodist Hospital. O'Neal's counsel stated that he had had bad experiences with nurses on juries. Moreover, he said he was concerned that veniremember 258 would be especially sympathetic toward Ted Millette because Ted Millette's voice box had been removed and he had to use a special device to talk. Accordingly, we hold that O'Neal's explanation for the challenge was a clear, specific, and legitimate reason that relates to this particular case and which is nondiscriminatory.
We now turn to our evaluation of the trial court's determination regarding O'Neal's proffered explanations for striking veniremembers 198, 192, and 186. We conclude that as to these three veniremembers, O'Neal failed to proffer adequate, facially race-neutral reasons for its peremptory strikes.
With regard to veniremember 198, O'Neal's counsel said that she used two sentences without verbs or with improper verb forms. Counsel further explained that it was important to his case that the jurors be able to understand documents and their modifications.
The record shows, however, that veniremember 198 was a school teacher employed by the Jefferson County Board of Education. We further note that under the requirements of § 16-23-1, Ala. Code 1975, she is required to hold a certificate issued by the state superintendent of education as evidence that she has met the minimum requirements for certification set by the state board of education. Moreover, O'Neal's counsel asked what subject she taught but did not ask any questions on voir dire regarding her educational background or her ability to understand contracts or written English.
The United States Supreme Court has held, and this Court has reiterated the holding, that among the things to be considered by the trial court in determining whether a prima facie showing has been made are "[t]he type and manner of the [responding party's] attorney's questions and statements during voir dire, including nothing more than desultory voir dire." Ex parteBranch, 526 So.2d at 623, citing Batson, 476 U.S. at 97,106 S.Ct. at 1723, 90 L.Ed.2d at 88; and "[t]he type and manner of questions directed to the challenged juror, including a lack of questions or a lack of meaningful questions." Ex parte Branch, 526 So.2d at 623.[3] These considerations are also relevant in determining whether the nonobjecting litigant's proffered reasons are a sham or pretext. Ex parte Branch, 526 So.2d at 624.
In Scales v. State, 539 So.2d 1074 (Ala. 1988), we examined the prosecutor's explanation "that he thought that the first [struck veniremember] was slow in responding to questions put to the venire, and he questioned her ability to understand the State's case against the defendant, *Page 1231 
which involved complex issues." In reversing the judgment of the Court of Criminal Appeals, we held that the prosecutor's explanations for the use of his peremptory strikes were facially race neutral. Scales, 539 So.2d at 1075.
In Ex parte Bird, however, we noted that explanations such as "communication difficulty" are "especially subject to abuse because of their insusceptibility to an objective evaluation by the trial judge." 594 So.2d at 685. Similarly, a party's concerns over a veniremember's use of idiomatic language in conversation are "especially subject to abuse." Considering the substance of O'Neal's proffered explanation and the lack of any meaningful voir dire of this veniremember, we conclude that O'Neal failed to articulate a credible, facially race-neutral explanation for striking veniremember 198 and that the trial court's determination with regard to this veniremember was clearly erroneous.
In Ex parte Branch, we stated that among the types of evidence that can be used to show that a proffered explanation is a sham or pretext is " 'an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.' " 526 So.2d at 624, quoting Slappy v.State, 503 So.2d 350, 355 (Fla.Dist.Ct.App. 1987). In Exparte Branch, we noted as an example of this type of evidence "an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror." 526 So.2d at 624.
Having reviewed the video record of voir dire in this case, we note that O'Neal's counsel did not ask veniremembers 192 and 186 any questions regarding their education or their ability to understand written English. Moreover, the only questions regarding education were directed toward two other veniremembers regarding their courses of study in college. Because of their employment, O'Neal's counsel concluded that veniremembers 192 and 186 probably did not have a high level of education. By asking appropriate questions, O'Neal's counsel could have either substantiated or allayed any concerns regarding the veniremembers' education level or ability to understand documents.
Other than Scales, the cases cited by O'Neal deal with veniremembers who were struck because they were unemployed,[4]
because they were similarly situated with the criminal defendant,[5] or because voir dire questioning showed that they were unable to read and write or possessed a limited degree of sophistication and education.[6] As noted above, Scales dealt with particular behavior of the challenged veniremember rather than assumptions drawn from the veniremember's employment. We, therefore, conclude that O'Neal failed to articulate a clear, specific, and legitimate reason for the challenge that relates to this particular case and that is nondiscriminatory.
Because O'Neal failed to provide an adequate, facially race-neutral explanation for striking veniremembers 198, 192, and 186, the Millettes must be given a new trial.Thomas, 551 So.2d at 346. Accordingly, we reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
HORNSBY, C.J., and ADAMS, J., concur.
STEAGALL and KENNEDY, JJ., concur in the result.
[1] The omitted subdivisions (A)-(H) address particular conduct or circumstances that are examples of sufficient contacts and are not necessary to the resolution of the issue before us.
[2] We note, for the benefit of the bench and bar, that under Exparte Branch, 526 So.2d at 623, the party responding to aBatson objection is required to articulate facially race-neutral explanations for his strikes only after the trial court has determined that the objecting party has made a prima facie showing of discrimination. Where the trial court finds that a prima facie showing has not been made and the responding party does not state its reasons for its peremptory strikes, we will review only the trial court's initial determination.
[3] See also, Ex parte Bird, 594 So.2d 676, 680 (Ala. 1991);Harrell v. State, 571 So.2d 1270 (Ala. 1990); Harrell v. State,555 So.2d 263 (Ala. 1989); Avery v. State, 545 So.2d 123, 128
(Ala.Crim.App. 1988) (state's voir dire was perfunctory and general in nature; voir dire lacked specific meaningful questions directed to the veniremembers struck).
[4] Stephens v. State, 580 So.2d 11, 19 (Ala.Crim.App. 1990), andCurrin v. State, 535 So.2d 221, 223 (Ala.Crim.App. 1988).
[5] Harrell v. State, 555 So.2d 263, 268, n. 1 (Ala. 1989).
[6] Williams v. State, 548 So.2d 501, 505-06
(Ala.Crim.App. 1988); and People v. Charron, 193 Cal.App.3d 981,238 Cal.Rptr. 660 (Cal.Dist.Ct.App. 1987). *Page 1232