[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 163 
The Bruners appeal from a judgment based on a jury verdict in favor of Dr. Thomas H. Cawthon and his professional corporation [hereinafter, "Dr. Cawthon"], in an action alleging medical malpractice and the wrongful death of the Bruners' son. The Supreme Court transferred the cause to this court pursuant to Ala. Code 1975, § 12-2-7(6).
On appeal, the Bruners raise two issues relating to jury selection. First, they claim that the trial judge erred by denying their challenges for cause as to six jurors who were patients of Dr. Cawthon or one of his partners, had relatives who were patients of Dr. Cawthon or one of his partners, or had dealt with Dr. Cawthon in a professional capacity.
Next the Bruners argue that Dr. Cawthon exercised his peremptory challenges in a racially discriminatory manner and violated the principles announced in Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Ex parteBranch, 526 So.2d 609 (Ala. 1987).
 Challenges for Cause
A total of 18 prospective jurors answered that they were or had been patients of Dr. Cawthon or one of his partners or had a family member who was or had been a patient of Dr. Cawthon or one of his partners. The trial court granted the Bruners' challenge for cause as to 12 of those veniremembers, most of whom were current patients of Dr. Cawthon. The court denied the challenges for cause as to the following six jurors: Juror Number 16A, whose daughter was currently a patient of Dr. Stronach, Dr. Cawthon's partner; Juror Number 41, whose niece had been Dr. Cawthon's patient three years earlier; Juror Number 98, who was the director of pharmacy at Jackson Hospital, a hospital at which Dr. Cawthon practices; Juror Number 37B, a former patient of Dr. Cawthon; Juror Number 40, a former patient of Dr. Carroll, Dr. Cawthon's partner; and Juror Number 301, a former patient of Dr. Cawthon.
In Knop v. McCain, 561 So.2d 229, 232 (Ala. 1989), our supreme court summarized the law on challenges for cause as follows:
 "In challenging a juror for cause, the test to be applied is that of probable prejudice. Alabama Power Co. v. Henderson, 342 So.2d 323, 327
(Ala. 1976). While probable prejudice for any reason will serve to disqualify a prospective juror, qualification of a juror is a matter within the discretion of the trial court. Id.; Black Belt Wood Co. v. Sessions, 514 So.2d 1249, 1255-56
(Ala. 1986); Village Toyota Co. v. Stewart, 433 So.2d 1150, 1156 (Ala. 1983). This Court must look to the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised. Id. A reversal is not appropriate absent abuse of this discretion. Alabama Power Co. v. Henderson, 342 So.2d at 327; Grandquest v. Williams, 273 Ala. 140, 135 So.2d 391
(1961); Mutual Building Loan Ass'n v. Watson, 226 Ala. 526, 147 So. 817 (1933); Brown v. Woolverton, 219 Ala. 112, 115, 121 So. 404 (1928); see Clark v. State, 443 So.2d 1287 (Ala.Crim.App. 1983).
 "Ultimately, the test to be applied is whether the juror can set aside her opinions and try the case fairly and impartially, according to the law and the evidence. Tidmore v. City of Birmingham, 356 So.2d 231 (Ala.Crim.App. 1977), cert. denied, 356 So.2d 234 (Ala.), cert. denied, 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 132 (1978); see Willingham v. State, 262 Ala. 550, 552, 80 So.2d 280
(1955); Mahan v. State, 508 So.2d 1180
(Ala.Crim.App. 1986). This determination, again, is to be based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Thus, a prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and a verdict rendered according to the evidence. See Fordham v. State, 513 So.2d 31, 34-35
(Ala.Crim.App. 1986); Jarrell v. State, 355 So.2d 747, 749 (Ala.Crim.App. 1978)."
Although "a doctor-patient relationship between a potential juror and a party to a *Page 165 
lawsuit is prima facie evidence of probable prejudice on the part of the potential juror," Bell v. Vanlandingham,633 So.2d 454, 455 (Ala. 1994); Roberts v. Hutchins, 613 So.2d 348
(Ala. 1993), there is no absolute rule excluding a patient as a juror in a case against his or her personal physician. Dixon v.Hardey, 591 So.2d 3, 7 (Ala. 1991). "It continues to be the trial court's responsibility to determine whether that presumption can be overcome." Bell v. Vanlandingham, 633 So.2d at 455.
"[T]he simple extraction of an affirmative response from a potential juror does not necessarily absolve that juror of probable prejudice." Wood v. Woodham, 561 So.2d 224, 228
(Ala. 1989). "Where a juror vacillates in her response to voir dire, her answers must be 'taken as a whole,' [and] when the aggregate effect of her response tends to verify the existence of 'deep-seated impressions,' she must be excluded for cause."Dixon v. Hardey, 591 So.2d at 7 (quoting Knop v. McCain
561 So.2d at 233). Because a juror's responses must be "taken as a whole," and the "aggregate effect" of those responses is determinative, we set forth in their entirety the answers of the challenged jurors.
Upon the trial court's questioning of Juror Number 16A, whose daughter was currently a patient of Dr. Stronach, Dr. Cawthon's partner, the following occurred:
 "Q. . . . . [B]oth sides want twelve folks that will fairly and impartially hear this matter and tell them who is at fault, or not at fault. Do you feel that because you were treated by Dr. Cawthon['s partner] and he has treated your daughter, do you feel that you can do that without leaning towards him?
"A. I believe I could be fair.
"Q. Without leaning towards him?
"A. I wouldn't lean towards him, no, sir."
 "Q. Okay, you feel that he treated your daughter well, but if he treated, — if the work was not, — was negligent or not up to par, could you still say that you treated my daughter, gave her good medical care, but you didn't do it in this case?
"A. Yes, sir, I believe so.
"BY MR. TIPLER [Counsel for the Bruners]:
 "Q. Is your daughter going back to see Dr. Cawthon after —?
 "A. Well, she saw Doctor Stronach, and Doctor Stronach was the one that originally — five or six years ago detected a hearing loss. And when she saw him back in August, all he did was write a letter to the school so they could be advised of her hearing impairment so it would be on her acceptance into her college. I don't think she took any medicine or testing at that time, but as her physician, he had to write a letter to that effect.
 "Q. You feel kindly towards Doctor Stronach for helping you out because of that?
 "A. I wouldn't say that, but I feel like he did what was correct. I mean, from that standpoint, he didn't do anything improper by signing the letter. I don't feel that way, no, sir.
 "Q. Do you feel like if you have to take your daughter back to Doctor Stronach, if you render a verdict against his partner, that you might feel a little uneasy about taking your daughter back there for treatment[?]
"A. No, sir."
Juror Number 16A expressed no uncertainty about his ability either to render a fair verdict according to the evidence or to return his daughter to Dr. Cawthon's partner for treatment. Compare Boykin v. Keebler, 648 So.2d 550, 551-52 (Ala. 1994);Wright v. Holy Name of Jesus Medical Center, 628 So.2d 510
(Ala. 1993). Here, as in Haisten v. Kubota Corp., 648 So.2d 561,564 (Ala. 1994),
 "the trial judge questioned the potential juror. The trial judge observed [his] demeanor and weighed [his] answers accordingly. [He] was asked whether [he] could render a fair and impartial verdict, and [he] answered affirmatively. The record shows no abuse of discretion." *Page 166 
The trial court questioned Juror Number 41, whose niece had been Dr. Cawthon's patient three years earlier, as follows:
 "Q. Do you feel if you are selected to serve on this jury, that would cause [you] to say, wait, you have to do a little bit more, plaintiff, than what the law requires you to do before I say that Doctor Cawthon is negligent. At the same time — did you have a good result with your niece?
"A. Yeah.
 "Q. At the same time, of course you are not going to be against Doctor Cawthon, in favor of the plaintiff, and you feel you can do that and take your niece back to the doctor, you can say you were at fault in this case, Doctor Cawthon?
 "A. Yeah, I think I can be honest with the problem. If the evidence is there, that's what it's weighed on.
 "Q. Okay. And you could tell Doctor Cawthon you were negligent in this case, although you treated my niece, but you were negligent in this case?
"A. Well, if the evidence is there —."
In Boykin v. Keebler, our supreme court held that a veniremember whose daughter was a patient of the defendant physician was presumed to be "probably prejudiced" in favor of the physician. The court explained:
 "[I]t is clear that the association between a mother and the doctor who treats her child is inherently a close, personal relationship built upon trust and confidence. That relationship requires that the mother and her child's doctor be in close consultation regarding the child's health and well-being. It follows that the same 'probable prejudice' that arises where a patient sits in judgment of his physician's case also arose under the facts of this case."
Boykin, 648 So.2d at 552. Here, the fact that the niece of Juror Number 41 had been Dr. Cawthon's patient did not give rise to any presumption of probable prejudice on the part of the juror. The factors that prompted the court to apply the probable prejudice standard to the parent of a patient are not (except in extraordinary circumstances) present for the aunt of a patient. No extraordinary circumstances were shown here. The trial court did not abuse its discretion by denying the challenge for cause as to Juror Number 41.
When the trial court questioned Juror Number 98, the director of pharmacy at Jackson Hospital, the following occurred:
 "Q. If you were selected to serve on this jury and the plaintiff[s] reached their burden of proof, could you tell that doctor that he was negligent in this case, maybe he's done good for fifty years, but he was negligent in this case, you can still face him?
"A. Yes.
"Q. You could?
"A. Yes.
"Q. He practices at Jackson?
"A. Right, he does.
 "A. And you could still fill his prescriptions and see him every day, after ruling against him?
"A. I can.
 "Q. Of course, if the plaintiff doesn't meet its burden, you should rule for the doctor?
"A. Right.
". . . .
 "Q. [Juror Number 98], again being the director of pharmacy at Jackson Hospital, how is your business connected with Doctor Cawthon from a financial standpoint?
 "A. We don't fill outpatient prescriptions. We are just there for the inpatients as they come in, and only fill inpatient orders.
 "Q. So you don't reap any financial benefits from Doctor Cawthon, other than if the patient is in the hospital?
"A. Only thing we do is inpatients.
"Q. How often do you see Doctor Cawthon?
"A. I may see him once a month.
 "Q. Do you associate with him outside your work area?
"A. No. *Page 167 
 "Q. And you don't have any financial connection to his office?
"A. None."
Juror Number 98 expressed no reservations about his ability to serve as an impartial juror. His answer, that he could deal with Dr. Cawthon on a professional basis even after having rendered a verdict against him, was not ambivalent. CompareSewell v. Webb, [Ms. 2940330, August 18, 1995] ___ So.2d ___ (Ala.Civ.App. 1995) (juror who was under logging contract with defendant timber company vacillated in answer to question whether he would be influenced by the business relationship). Unlike the situations present in Knop v. McCain, supra, and other cases recently decided by our supreme court, the responses by Juror Number 98 were clear and unequivocal. The challenge for cause was correctly denied.
The trial court questioned Juror Number 37B, a former patient of Dr. Cawthon, as follows:
 "Q. In light of that [the fact that Dr. Cawthon treated you several years ago], and you have been his patient and he's been your doctor, if you are selected to serve, do you feel that you could render, — and of course if the plaintiff doesn't meet the burden, you could say to the plaintiff, you didn't reach the burden, Doctor Cawthon is not at fault. If the [plaintiffs do] meet their burden, do you feel you can tell your own doctor you were negligent in this case, and you owe a certain amount of money?
"A. I think so.
 "Q. You could? Then go back to him if you had to go back to him again?
 "A. There are other doctors here in Montgomery, I mean — I think so, it would be hard to say yes, but yes, I could. Or no, I couldn't, but I think so.
 "Q. But you do believe that the fact that you were his patient a couple years ago, you consider him to be your doctor, if you were selected to serve, you could evaluate the evidence and tell whichever side is unsuccessful, this is what I find it to be and this is my decision?
"A. Uh-huh.
"Q. Without compromising your conscience?
"A. Yes, sir."
The Bruners' counsel further questioned Juror Number 37B:
 "Q. You mentioned there are other doctors in Montgomery, what we're trying to do is find out — we know everybody is going to try to do their best to be fair, but if in fact you found the evidence to be against Doctor Cawthon, what I hear you say is that you might find it difficult to go back to him and look him in the eye, and say, look, I'm sorry, I found that you were at fault here?
 "A. I guess I would say that all doctors make mistakes sometime, like everybody does. And I don't think whether it's that doctor or any doctor, I don't think that any of them are perfect all the time, whether it's my doctor that I go to or any other doctor.
"BY THE COURT:
 "Q. Well, let me ask you this, then, if you find that your doctor made a mistake, should he be held accountable?
"A. Oh, yeah."
In Wright v. Holy Name of Jesus Medical Center, 628 So.2d 510
(Ala. 1993), our supreme court held that a juror who stated that she would feel "awkward" returning to her doctor for treatment if she served on the jury in a medical malpractice action against him should have been stricken for cause. Although Juror Number 37B expressed some reservation about whether she would return to Dr. Cawthon after having served on a jury that determined he was guilty of malpractice, there are two reasons why her responses did not mandate that she be struck for cause. First, as a former patient of Dr. Cawthon, she was not subject to the probable prejudice presumption. Bell v. Vanlandingham, 633 So.2d at 455. Second, her responses, taken as a whole, and particularly her answers that all doctors make mistakes and should be *Page 168 
"held accountable," indicate objectivity and a willingness to decide the case on its facts rather than a preconceived bias toward the physician.
Upon the trial court's questioning of Juror Number 40, who five years earlier had been a patient of Dr. Carroll, Dr. Cawthon's partner, the following occurred:
 "Q. If you were selected to serve on this jury, Doctor Cawthon practices with Dr. Carroll, do you feel that you could go on and sit on this trial and if the [plaintiffs meet] their burden of proof, and tell Doctor Cawthon that he was negligent? And of course at the same time, if the [plaintiffs don't] meet their burden, you could tell the plaintiff that Doctor Cawthon is not at fault, do you feel you could do that, and he practices with your doctor?
"A. Yes, sir.
 "Q. Okay. Do you feel that you wouldn't have any hesitation in following the evidence, and whichever side is successful, just tell them what [you] find it to be?
"A. Yeah.
 "Q. Do you feel you could go [back] to Doctor Carroll after that if you had to?
"A. Yes, sir, if necessary, I could."
Our supreme court has observed:
 "This Court cannot and does not seek to supplant the functions of the trial court in evaluating the personal demeanor of the jurors. Once a juror makes an initial statement that is vague, ambiguous, equivocal, uncertain, or unclear or that shows confusion, it is the trial judge's function to question the juror further, so as to ascertain whether the juror can be impartial. However, once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions, so as to show that he or she cannot be neutral, objective, or impartial, the challenge for cause must be granted."
Wright v. Holy Name of Jesus Med. Center, 628 So.2d at 513 (quoting Knop v. McCain, 561 So.2d at 234). If a juror's responses are not vague, ambiguous, or uncertain, but clear and unequivocal, and if those responses reveal that the juror can be neutral, objective and impartial, the trial court does not abuse its discretion by declining to strike that juror for cause. The answers given by Juror Number 40 were clear and straightforward and indicated an impartial attitude. The trial court did not abuse its discretion by denying the challenge for cause as to Juror Number 40.
Juror Number 301 stated that she had been "a patient of Doctor Cawthon's for several years." The trial court inquired whether she "still call[ed] him [her] doctor," and she replied, "No." She was not asked any further questions. Here, as inBell v. Vanlandingham, the juror had no ongoing doctor-patient relationship with the defendant doctor, and thus there was no presumption of probable prejudice. The trial court's decision not to strike Juror Number 301 from the venire was not an abuse of discretion. Bell v. Vanlandingham, 633 So.2d at 455.
The trial court dismissed for cause 12 jurors who had a connection with Dr. Cawthon, but retained 6 others who, the court determined, were unbiased. We conclude, as our supreme court did in Roberts v. Hutchins, 613 So.2d at 350, that the trial court "based its determination upon its own observations and impressions of the potential jurors," and, thus, conscientiously exercised its discretion to exclude only those veniremembers who, it thought, were unable to render a fair verdict. We find no abuse of discretion.
This court cannot speculate about which party had to use the most peremptory strikes to remove jurors it found "undesirable." Our function is to review the trial court's rulings to determine whether each juror's answers constituted grounds for a challenge for cause. Here, they did not.
Where no single instance of alleged error amounts to reversible error, the cumulative effect of the alleged errors cannot be considered to be any greater. Hunt v. State,642 So.2d 999, 1059 (Ala.Crim.App. 1993), affirmed, 642 So.2d 1060
(Ala. 1994). *Page 169 
 Peremptory Challenges
The record before us is not entirely clear, but it appears that after the challenges for cause were granted, 32 persons remained on the panel from which the jury was selected. Of that number, there were 22 whites (69%), 9 blacks (28%), and 1 person who had identified herself as "Oriental" (3%). The defense used 6 of its 10 strikes to remove black jurors from the panel; the defense also struck the 1 Oriental and 2 whites. The plaintiffs used all of their 10 strikes to remove white jurors. The trial jury was composed of 9 whites (75%) and 3 blacks (25%).
The Bruners argue that the trial court erred by not requiring defense counsel to give a reason for striking Juror Number 24, a Philippine woman who identified her ethnic group as "Oriental" on the juror questionnaire. However, when the trial court stated that it did not consider the Philippine woman to be included within the holding of Batson, counsel for the Bruners said nothing.
The trial court erred by stating that Batson does not apply to the strikes of Asian/Oriental veniremembers. See Wilsher v.State, 611 So.2d 1175, 1184 (Ala.Crim.App. 1992). However, by standing mute and failing to bring the error to the court's attention in a timely manner, the Bruners failed to preserve the error for appellate review. See Rieber v. State,663 So.2d 985 (Ala.Crim.App. 1994), affirmed, 663 So.2d 999 (Ala. 1995) (failure to object to strike of Asian-American juror until motion for new trial constitutes a waiver in a noncapital case).
Dr. Cawthon's counsel stated that he struck Juror Number 29 and Juror Number 75, both black females, because they had worked in facilities where "they take care of handicapped children. . . . and [their] association with handicapped children would be such that we would not want [them] on the jury where the Bruners are claiming" that their son suffered brain injuries. That is a race-neutral reason. See Millette v.O'Neal Steel, Inc., 613 So.2d 1225, 1230 (Ala. 1992) (strike of a nurse because, as a member of a caretaking profession, she might tend to be more sympathetic, held race neutral); Powellv. State, 608 So.2d 411 (Ala.Crim.App. 1992) (same).
The Bruners argue that the venire included a white juror who worked with handicapped children and that the defendant did not strike that juror. That argument, however, was not made at trial, and no evidence to that effect was presented to the trial judge in order to show that the reasons given by Dr. Cawthon's counsel were pretextual. It is not the responsibility of an appellate court to conduct an "independent" review of the record in regard to a Batson claim. Hernandez v. New York,500 U.S. 352, 367, 111 S.Ct. 1859, 1870, 114 L.Ed.2d 395 (1991).
Counsel explained that he struck Juror Number 73, a black male, because he had two young grandchildren about the same age as the Bruners' son. That is also a race-neutral reason. SeeFisher v. State, 587 So.2d 1027 (Ala.Crim.App.), cert. denied, 587 So.2d 1039 (Ala. 1991), cert. denied, 503 U.S. 941,112 S.Ct. 1486, 117 L.Ed.2d 628 (1992) (strike of jurors who had children the same age as the accused and who therefore might tend to sympathize with him, held race-neutral).
Juror Number 93 was struck because he had been charged with assault and may have been a plaintiff in a prior personal injury lawsuit. A veniremember's connection with criminal activity is a race-neutral reason for the strike of that veniremember. See Wilsher v. State, 611 So.2d at 1183.
Defense Counsel stated that he struck Juror Number 35, a black female, because "on her questionnaire [she] had numerous misspelled words. . . . [I]n our opinion, that indicated that she would have a hard time following the complex nature of this case." The trial court responded:
 "BY THE COURT: I'm sure that you have some white folks that can't . . . spell well. Is her questionnaire the only one that had misspelled words?
 "BY MR. KEENE: Well, it had numerous ones and it stood out. I can't say that any others didn't have them." *Page 170 
Defense counsel explained that he struck Juror Number 34 because she was an "extremely young female, 22 years old, who is on or has been on welfare." The following then transpired:
 "BY THE COURT: Well, now the Appellate Courts of Alabama say age and being unemployed on welfare are not good cause for [a] strike, I know on the criminal side they have said that.
 "BY MR. KEENE: Well I don't know if the civil side said it, but that's the reason we struck her. I am being very honest with you, we would rather, on the type case like this, have people that are older. "BY THE COURT: Well, I know you would, but I'm just saying that's not good cause. Go ahead to the next one."
At the conclusion of the Batson hearing, the trial court made the following ruling:
 "[S]ince there's three blacks left on the jury, and you know, everybody struggling, trying to get a fair jury here, and the Court can understand [Juror Number 29 and Number 75] being struck, but the only two I am concerned about [are] [Juror Number 35 and 34], and I conclude that I can accept those reasons. I don't like those reasons but I can accept those reasons under the law so the Batson motion is denied."
The Bruners argue that the reason given for striking Juror Number 34, that she was "extremely young," violates the principles of Batson and Ex parte Bird, 594 So.2d 676, 682-83
(Ala. 1991). Our supreme court has recognized that, although "the age rationale is highly suspect because of its inherent susceptibility to abuse," Ex parte Bird, 594 So.2d at 683, in certain cases age may serve as a legitimate race-neutral reason for a peremptory strike, Ray Sumlin Constr. Co. v. Moore,583 So.2d 1320, 1322 (Ala. 1991); Harrell v. State, 555 So.2d 263,268 n. 1 (Ala. 1989).
The Bruners also argue that young white jurors were not struck. As we have observed, however, if the opponent of a peremptory strike does not present evidence to show that the reasons asserted for the strike were pretextual, it is not the duty of an appellate court to conduct an independent review of the record. Hernandez v. New York, 500 U.S. at 367,111 S.Ct. at 1870.
Relying on Millette v. O'Neal Steel, Inc., supra, the Bruners argue that the explanation given for the strike of Juror Number 35 was constitutionally inadequate. In Millette, counsel struck a veniremember who made grammatical errors in her answers to voir dire questions. Counsel explained "that it was important to his [contract] case that the juror be able to understand documents and their modifications." Millette, 613 So.2d at 1230. Our supreme court held that, in light of the undisputed fact that the prospective juror was a schoolteacher, counsel had an insufficient basis for assuming that the veniremember lacked the ability or educational background to understand written contracts.
Millette is not controlling, either factually or legally, here. Factually, there is nothing in the record before us, as there was in Millette, to contradict counsel's assumption that Juror Number 35 lacked the ability or the educational background to understand the issues in the case. The questionnaire filled out by Juror Number 35 not only demonstrated that the veniremember had misspelled a number of words, but it also showed that she was a high school dropout. Therefore, counsel's hypothesis that Juror Number 35 might have "a hard time following the complex nature" of a medical malpractice case was supported by — not contradicted by — the record.
Legally, the analysis used in Millette has been superseded. Since Millette was decided three years ago, the United States Supreme Court has substantially altered what the proponent of a peremptory strike must do in order to survive a Batson
challenge. See Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769,131 L.Ed.2d 834 (1995).
In Purkett, the Court upheld the trial court's finding that a peremptory strike based on a prospective juror's long, unkempt hair was not racially discriminatory. The Court summarized the procedural steps in a Batson hearing: *Page 171 
 "Under our Batson jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful racial discrimination."
___ U.S. at ___ _ ___, 115 S.Ct. at 1770-71. The Court then explained step 2 of the procedure:
 "The second step of this process does not demand an explanation that is persuasive or even plausible. 'At this [second] step of the inquiry, the issue is the facial validity of the . . . explanation. Unless a discriminatory intent is inherent in the . . . explanation, the reason offered will be deemed race neutral.' Hernandez, 500 U.S. at 360 [111 S.Ct. at 1866] (plurality opinion); id. at 374 [111 S.Ct. at 1874] (O'Connor, J., concurring in judgment).
 "The Court of Appeals erred by combining Batson's second and third steps into one, requiring that the justification tendered at the second step be not just neutral but also at least minimally persuasive, i.e., a 'plausible' basis for believing that 'the person's ability to perform his or her duties as a juror' will be affected. [Elem v. Purkett] 25 F.3d [679], at 683 [8th Cir. 1994]. It is not until the third step that the persuasiveness of the justification becomes relevant — the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. Batson, supra, at 98 [106 S.Ct. at 1723-24]; Hernandez, supra, at 359 [111 S.Ct. at 1866] (plurality opinion). At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge may choose to disbelieve a silly or superstitious reason at step 3 is quite different from saying that a trial judge must terminate the inquiry at step 2 when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. Cf. St. Mary's Honor Center v. Hicks, 509 U.S. [502], [506-08], 113 S.Ct. 2742, 2747 [125 L.Ed.2d 407] (1993)."
Purkett ___ U.S. at ___, 115 S.Ct. at 1771 (emphasis added by the Court in Purkett).
Batson required the proponent of a strike to give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the strike and demanded that the reasons be "related to the particular case to be tried."Batson, 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20. Purkett, however, "does not require an explanation that is persuasive or even plausible." ___ U.S. at ___, 115 S.Ct. at 1771. It demands "not a reason that makes sense, but a reason that does not deny equal protection." Id.
In Millette, the focus was on the plausibility of the explanation for the strike at the second stage of the inquiry. However, following the decision in Purkett, the inquiry in this case should be: was counsel's reason — that he struck Juror Number 35 because her spelling errors indicated she might have "a hard time following the complex nature" of a medical malpractice case — racially discriminatory on its face. The clear answer to that inquiry is "no." The reason was not inherently discriminatory, because poor spelling is not a characteristic peculiar to any race. Similarly, the fact that counsel struck Juror Number 34 because of her youth is not racially discriminatory on its face. Counsel's asserted reasons for striking Jurors Number 34 and 35 thus survived step 2 of the process outlined in Purkett.
Step 3 of the process involves the trial court's deciding whether, in light of all relevant circumstances, counsel's peremptory challenges were motivated by discriminatory intent.Purkett, ___ U.S. at ___, 115 S.Ct. at 1771. The Supreme Court has observed:
 "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in Batson, the finding will 'largely turn on evaluation of credibility.' 476 U.S., at 98, n. 21, 106 S.Ct., at 1724, n. 21. In the typical peremptory challenge inquiry, *Page 172 
the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the [lawyer's] state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841
(1985), citing Patton v. Yount, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984)."
Hernandez v. New York, 500 U.S. at 365, 111 S.Ct. at 1869.
It is well settled that the ruling of the trial court on aBatson motion is entitled to substantial deference and will not be disturbed on review unless it is clearly erroneous. Ex parteBankhead, 625 So.2d 1146 (Ala. 1993).
 "[W]hen a trial court requires a party to state his reasons for peremptorily striking a juror and that party does state a reason or reasons, the trial court's determination as to the legitimacy of the reason or reasons will be set aside only if that determination is clearly erroneous."
Meads v. RPM Pizza, Inc., 639 So.2d 1352, 1354 (Ala. 1994); Exparte Branch, 526 So.2d 609, 625 (Ala. 1987). Judge Price's ruling on the Batson motion parallels what the United States Supreme Court held in Purkett: a trial judge may not "like," or agree with, counsel's reasons for striking a particular juror, yet he, like Judge Price, may "accept those reasons under the law" if he determines that counsel was not motivated by discriminatory intent.
We conclude that the trial court's ruling on theBatson motion was not clearly erroneous and is due to be upheld.
The judgment of the trial court is affirmed.
AFFIRMED.
THIGPEN, J., concurs.
ROBERTSON, P.J., and YATES, J., concur in the result.
MONROE, J., dissents.