681 So.2d 173 (1996)
Ex parte Anne BRUNER and James Bruner, individually and as administratrix and administrator of the Estate of James Holland Bruner, deceased.
(Re Anne BRUNER and James Bruner, etc. v. Thomas H. CAWTHON, M.D., F.A.C.S., P.C., et al.).
1950451.
Supreme Court of Alabama.
August 30, 1996.
James H. Tipler of Tipler Law Firm, Andalusia, for petitioners.
Thomas H. Keene, Fred W. Tyson and N. Wayne Simms, Jr. of Rushton, Stakely, Johnston & Garrett, Montgomery, for respondent.
PER CURIAM.
The writ of certiorari is quashed as improvidently granted.
In quashing the writ, however, this Court disapproves the reliance of the Court of Civil Appeals on Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and Purkett v. Elem, ___ U.S. ___, 115 S. Ct. 1769, 131 L.Ed.2d 834 (1995). Those federal cases do not control Alabama's peremptory challenge procedure, which is based on adequate and independent state law.
WRIT QUASHED AS IMPROVIDENTLY GRANTED.
SHORES, KENNEDY, INGRAM, and BUTTS, JJ., concur.
COOK, J., concurs specially.
HOOPER, C.J., and MADDOX, ALMON, and HOUSTON, JJ., concur in the result.
COOK, Justice (concurring specially).
I concur in the decision to quash the writ of certiorari as improvidently granted. However, I am compelled to disagree expressly with two views presented by Justice Maddox in his special concurrence regarding the procedures Alabama has developed to eliminate discrimination in petit jury selection. The first area of disagreement involves his premise that the procedure developed in this state is grounded on, and controlled by, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its federal court progeny. The second area is his conclusion that in Alabama the burden of proof of discrimination, which is on the opponent of the strike, is equivalent to the one currently required by the United States Supreme Court. I shall address each of these conclusions more fully in the following sections.

I. Origin of Alabama Discrimination Procedure
The first point on which I disagree with Justice Maddox is his premise that Batson forms the peremptory challenge framework *174 for Alabamaif not for every state in the country. According to this premise, Alabama's framework is based on federal law. Thus, Justice Maddox states that in Ex parte Bird, 594 So.2d 676 (Ala.1991), and Millette v. O'Neal Steel, Inc., 613 So.2d 1225 (Ala. 1992), we were "merely attempting to follow the Batson standard set forth by the United States Supreme Court." 681 So.2d at 185.
Justice Maddox's premise is consistent with the rationale of the Court of Civil Appeals, which refused to analyze the Bruners' claims of discrimination in the selection of their jury under the procedure this Court outlined in Millette. In particular, the Court of Civil Appeals stated: "Legally, the analysis used in Millette has been superseded. Since Millette was decided three years ago, the United States Supreme Court has [in Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)] substantially altered what the proponent of a peremptory strike must do in order to survive a Batson challenge." Bruner v. Cawthon, 681 So.2d 161 (Ala.Civ.App.1995).
However, the rationale of the Court of Civil Appeals, like Justice Maddox's premise, incorrectly assumed that Alabama's peremptory challenge framework is a matter of federal law. Ignored is the fact that the movement to reform the rules relating to discrimination in jury selection was initially a state court movement. This fact was made clear in Batson itself, which was decided only after a number of state courts had already taken the initiative in ameliorating the harsh rule of Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).[1] More specifically, Batson explained that two United States Circuit Courts of Appeals had recently "[f]ollow[ed] the lead of a number of state courts construing their State's Constitution" to challenge as discriminatory peremptory strikes based on evidence supplied in the "particular case," rather than requiring, as did the federal standard, proof of "systematic exclusion of blacks." Batson, 476 U.S. at 82 n. 1, 106 S.Ct. at 1715 n. 1 (emphasis added). As examples, the Court cited People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); State v. Neil, 457 So.2d 481 (Fla.1984); and Commonwealth v. Soares, 377 Mass. 461, 387 N.E.2d 499, cert. denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979). Batson, 476 U.S. at 82 n. 1, 106 S.Ct. at 1715 n. 1.
Significantly, when this Court in Ex parte Jackson, 516 So.2d 768 (Ala.1986), first discussed the operation of Batson, it relied on the same state cases cited in Batson as cases on which to establish the principle under consideration. The extent of this reliance is illustrated by the following excerpt from Jackson:
"In the face of the harsh burden of Swain, several state courts have found that their state constitutions required a lesser burden on a defendant. See State v. Neil, 457 So.2d 481 (Fla.1984); People v. Thompson, 79 A.D.2d 87, 435 N.Y.S.2d 739 (1981); State v. Crespin, 94 N.M. 486, 612 P.2d 716 (Ct.App.1980); Commonwealth v. Soares, 377 Mass. 461, 387 N.E.2d 499, cert. denied, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979), People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978).
"The Second Circuit in McCray v. Abrams, [750 F.2d 1113 (2d Cir.1984),] gave an excellent summary of the state court cases cited above and their analyses of their state constitutions. The California Supreme Court found that `the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution.' Wheeler, 22 Cal.3d at 276-77, 148 Cal.Rptr. at 903, 583 P.2d at 761-62. In Soares, supra, the Supreme Judicial Court of Massachusetts wrote:
"`What we view art. 12 of the Declaration of Rights as proscribing is the use of peremptory challenges to exclude prospective jurors solely by virtue of their *175 membership in, or affiliation with, particular, defined groupings in the community. Were we to decline to so hold, we would leave the right to a jury drawn from a representative cross-section of the community wholly susceptible to nullification through the intentional use of peremptory challenges to exclude identifiable segments of that community.'
"377 Mass. at 486, 387 N.E.2d at 515.
"We particularly note the holding of the Florida Supreme Court in Neil, supra:
"`Article I, section 16 of the Florida Constitution guarantees the right to an impartial jury. The right to peremptory challenges is not of constitutional dimension. The primary purpose of peremptory challenges is to aid and assist in the selection of an impartial jury. It was not intended that such challenges be used solely as a scalpel to excise a distinct racial group from a representative cross-section of society. It was not intended that such challenges be used to encroach upon the constitutional guarantee of an impartial jury. As did the New York, California, and Massachusetts courts, we find that adhering to the Swain test of evaluating the peremptory challenges impedes, rather than furthers, article I, section 16's guarantee. We therefore hold that the test set out in Swain is no longer to be used by this state's courts when confronted with the allegedly discriminatory use of peremptory challenges.'
"457 So.2d at 486.
"Although we know that the United States Supreme Court has not yet ruled on whether Batson v. Kentucky is to be applied retroactively, this Court does not need to await revelation from the federal judiciary when our own state constitution also guarantees to a criminal defendant the equal protection of the laws. Sections 1, 6, and 22, Ala. Const.1901, combine to guarantee equal protection of the laws. City of Hueytown v. Jiffy Chek Co., 342 So.2d 761 (Ala.1977)....
"The doctrine of equal protection of the laws requires that the guarantee of trial by an impartial jury not be illusory. The defendant Jackson was under the Swain burden when he attempted to show the prosecution's alleged discriminatory use of its peremptory strikes. This was too great a burden. Our state constitution requires that Jackson be entitled to test the prosecution's use of its peremptory strikes under a rule similar to the one set forth in Batson v. Kentucky:

"`[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group [citation omitted], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits `those to discriminate who are of a mind to discriminate.' [Citation omitted.] Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empanelling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.
"`In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a `pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative. We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the *176 circumstances concerning the prosecutor s use of peremptory challenges creates a prima facie case of discrimination against black jurors.'
"476 U.S. at 96-97, 106 S.Ct. at 1722-23.
"Once the defendant has made a prima facie case of purposeful discrimination, then the prosecution must come forward with valid non-racial reasons for its strikes. The Florida Supreme Court has given an illustration of the prosecution's burden:

"`The reasons given in response to the court's inquiry need not be equivalent to those for a challenge for cause. If the party shows that the challenges were based on the particular case on trial, the parties or witnesses, or characteristics of the challenged persons other than race, then the inquiry should end and jury selection should continue. On the other hand, if the party has actually been challenging prospective jurors solely on the basis of race, then the court should dismiss that jury `pool' and start voir dire over with a new pool.'
"Neil, 457 So.2d at 487.
"No merely whimsical or fanciful reason will suffice as an adequate explanation. In light of the circumstances of the case, the trial court must use its discretion in determining whether the prosecutor's reasons are adequate."
516 So.2d at 772-73 (emphasis added).
Undoubtedly, Jackson contains three of the most significant statements ever made by this Court on the subject of discrimination in jury selection. First, we said: "Although we know that the United States Supreme Court has not yet ruled on whether Batson v. Kentucky is to be applied retroactively, this Court does not need to await revelation from the federal judiciary when our own state constitution also guarantees ... the equal protection of the laws." 516 So.2d at 772 (emphasis added). Second, we said: "Our state constitution requires that Jackson be entitled to test the prosecution's use of its peremptory strikes under a rule similar to the one set forth in Batson v. Kentucky." 516 So.2d at 772 (emphasis added). By these two statements, this Court clearly demonstrated that it was not adopting the federal analysis set forth in Batson per se, but, rather, was adopting a quasi-Batson analysis based on Alabama state law. Third, we said: "Once the defendant has made a prima facie case of purposeful discrimination, then the prosecution must come forward with valid non-racial reasons for its strikes. The Florida Supreme Court has given an illustration of the prosecution's burden." 516 So.2d at 772 (emphasis added). We quoted the portion of State v. Neil, 457 So.2d 481 (Fla.1984), as establishing the standard of proof needed to rebut a prima facie case of discrimination. Then we added: "No merely whimsical or fanciful reason will suffice as an adequate explanation." 516 So.2d at 772 (emphasis added).
These cogent statements contained in our first discussion of the "Batson" issue established the framework of the analysis that was to be used in the courts of Alabama to this day. That they established the framework on adequate and independent state law grounds is clear from a fair reading of Jackson. If further proof of this fact was needed, it came quickly in Ex parte Branch, 526 So.2d 609 (Ala.1987).
In Branch, this Court reiterated the basis for resolving jury discrimination issues. The Court discussed at length the statutory "HISTORY OF THE DRAWING, SUMMONING, SELECTION AND EMPANELING OF JURIES IN ALABAMA." At the conclusion of this historical analysis, it stated:
"We believe that the Legislature intended, in adopting this public policy, that our trial juries should be selected from a list which contains a fair cross section of the area served by the court, and that any form of discrimination against a particular juror on account of race, color, religion, sex, national origin, or economic status is prohibited, and if liberally interpreted to apply to the ... use of peremptories, the state policy is not inconsistent with Batson or Jackson requirements."
526 So.2d at 618-19 (emphasis added).[2]
The Court then proceeded to flesh out the framework established in Jackson. In doing *177 so, it drew extensively from rules set forth in state cases, such as People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 148 Cal.Rptr. 890 (1978); People v. Hall, 35 Cal.3d 161, 672 P.2d 854, 197 Cal.Rptr. 71 (1983), People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986), and Slappy v. State, 503 So.2d 350 (Fla.Dist.Ct.App.1987), aff'd, 522 So.2d 18 (Fla.1988), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988), of those cases, Wheeler and Hall had preceded Batson. 526 So.2d at 622-24. We then emphasized: "The trial court, in exercising the duties imposed upon it, must give effect to the state policy expressed in Sections 1, 6, and 22 of the Alabama Constitution and Code 1975, § 12-16-55 and § 12-16-56." 526 So.2d at 624 (emphasis in original).
Four years later, in Ex parte Bird, 594 So.2d 676 (Ala.1991), we reversed the convictions of Terry Bird and Jacob Warner on the ground that the prosecution had exercised its peremptory strikes in a racially discriminatory manner. Id. at 678. More specifically, our review of the reasons offered by the prosecution convinced us that "the State's explanations for its peremptory strikes [fell] considerably short of the standard ... announced in Jackson and Branch." 594 So.2d at 682 (emphasis added). The absence of a reference in this statement to Batson or any other federal authority was conspicuous and intentional, for the Court sought to reinforce the ideaif it needed any reinforcement that peremptory strikes in Alabama were to be subject to review based on adequate and independent state law.
Bird should have dispelled any lingering confusion as to the source of authority for reviewing allegations of jury discrimination. By now, therefore, it should be clear to all that in making a "Batson" motion before the jury is empaneled and sworn, Alabama litigants are simply using "shorthand" terminology to invoke the analysis this Court bases on the Constitution and laws of Alabama. In other words, litigants should understand that in dealing with discrimination in jury selection, Alabama has followed the lead of her sister states in guaranteeing equal protection on the basis of adequate and independent state law.
The willingnessas well as the power and the dutyof the states to afford their citizens equal protection and due process on state-law grounds has been advocated by cases and commentators, including former United States Supreme Court Associate Justice William Brennan, Jr. Lecturing at the New York University School of Law on November 18, 1986, Justice Brennan identified what he perceived as the Supreme Court's "involv[ment] in a new curtailment of the Fourteenth Amendment's scope" of protection of individual "civil and political rights." W. Brennan, Jr., "The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights," 61 N.Y.U. L.Rev. 535, 546 (1986). After noting several specific examples of this phenomenon, he stated:
"For a decade now, I have felt certain that the Court's contraction of federal rights and remedies ... should be interpreted as a plain invitation to state courts to step into the breach.... Now, the diminution of federal scrutiny and protection out of purported deference to the states mandates the assumption of a more responsible state court role. And state courts have taken seriously their obligation as coequal guardians of civil rights and liberties."
Id. at 548 (emphasis added). See also Brooks v. Hobbie, 631 So.2d 883, 889 (Ala. 1993) ("the state court system may be a more appropriate forum for protecting [constitutional] rights [than the federal court system], because, in many instances, the individual rights provisions under the state constitution are ... broader than[ ] those in the federal Bill of Rights"); Vogel v. State, 426 So.2d 882, 885 (Ala.1982) (the United States Constitution provides only the floor for protection of liberty and property interests; state constitutions and statutes provide the ceiling) (Faulkner, J., concurring specially), cert. denied, 462 U.S. 1107, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983); Gilbreath v. Wallace, 292 Ala. 267, 271, 292 So.2d 651, 654-55 (1974) (Alabama may, when adjudicating *178 claims based on state law, "provide greater safeguards" than would be available under the United States Constitution). In developing a state-law framework for eliminating discrimination in jury selection, Alabama has laudably risen to the challenge to serve as a "coequal guardian[ ] of civil rights and liberties." W. Brennan, supra, at 548.
Evidently, however, considerable confusion remains as to the source of Alabama's peremptory challenge framework, which confusion is evidenced by the reasoning contained in Justice Maddox's special concurrence and in the Court of Civil Appeals' opinion in this case. The mischief that this confusion, if not dispelled, will inject into this area of the law will be incalculable.
For example, in properly applying state law, the bench and bar operate within a relatively small universe of case-law authority. Justice Maddox's universe, however, would include the entire federal court system. Because only the decisions of the United States Supreme Court are binding on our courts, litigants would be forced to scour every federal circuit for cases supporting their positions, thus inundating the bench and bar with often conflicting case law.
Just as the admiralty courts have created a system comprised of general and often relatively ill-defined principles, Batson litigation has created a sea of federal common law one that is continually evolving. Justice Maddox's approach would cast litigants adrift upon this sea of federal common law. Alabama would be ill served, indeed, by such an approach. For this reason, I have taken this opportunity to say clearly that Alabama's peremptory challenge procedure is based not on federal law, but squarely on adequate and independent state law.

II. Burden of Proof of Discrimination
In this connection, Justice Maddox states:
"[I]t seems clear that Ex parte Jackson and Branch applied Batson to Alabama cases and did not require anything different from what Batson required. The United States Supreme Court cases decided after Batson merely refined what Batson had said initially.... Purkett ... did not change the Batson standard, but merely clarified it."
681 So.2d at 185. Actually, because Alabama's procedure is not tied to the rule adopted and applied in the federal courts, questions regarding the burden of proof of discrimination under Branch and its Alabama progeny are, for me, unconnected with questions regarding the burden of proof under Batson and its federal progeny. Nevertheless, for the sake of clarity I will compare and contrast the Alabama rule with the federal rule.

A. Alabama Rule
The three-step procedural framework for eliminating discrimination in Alabama jury selection was succinctly described in Huntley v. State, 627 So.2d 1013 (Ala.1992), as follows:
"Upon the exercise of the ... first peremptory challenge of [an ethnic] veniremember, a[n opponent of the strike] is entitled to [(1) request and receive] a Batson hearing.[3]Harrell v. State, 555 So.2d 263, 267-68 (Ala.1989) (adopting a `bright line test' for determining the defendant's right to a hearing).... This hearing provides the [opponent] the opportunity to marshal all available evidence in order to construct a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 620 (Ala.1987); Ex parte Jackson, 516 So.2d 768, 772 (Ala.1986).... If the circumstances raise an inference of discrimination, the [proponent] must attempt to justify its challenges, [(2)] the burden having shifted to the [proponent] to rebut the defendant's prima facie case. Ex parte Bird, 594 So.2d 676, 680 (Ala.1991). Following the [proponent's] explanations, [(3)] the [opponent] may offer rebuttal evidence `showing that the reasons or explanations are merely a sham or pretext' for racial discrimination."
Huntley, 627 So.2d at 1014-15.
The second step of this procedure places the burden of persuasion of non discrimination upon the proponent of the strike to "articulat[e] a clear, specific, and legitimate *179 reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory." Ex parte Branch, 526 So.2d at 623 (emphasis in original). In Alabama, the proponent of a peremptory challenge must, in order to reshift the burden of persuasion of discrimination to the opponent, articulate at the second step a reason that is not only "legitimate," that is, one that is not inherently discriminatory, but "clear" and "specific." In other words, if, at the second step, the proponent fails to articulate a "clear, specific," nondiscriminatory reason for every strike, the inquiry ends and discrimination has been established; the trial court may notas a matter of lawempanel the jury as selected.
In Ex parte Bird, 594 So.2d 676 (Ala.1991), for example, the prosecution attempted to justify the use of "17 of [its] 20 peremptory strikes to eliminate 17 of the 19 black veniremembers," id. at 678, on grounds that, as to two of the challenged veniremembers, this Court rejected as constitutionally deficient. Specifically, the Court held invalid the prosecution's assertions that one veniremember lived in a high crime area, id. at 682-83, and that a second veniremember was "underemployed." Id. at 684-85. As to the first purported explanation, the Court stated: "[T]he bald assertion by the [proponent] that a veniremember lives in a high-crime area will not rebut a prima facie showing of discrimination." Id. at 685. As to the second, the Court stated: "[T]here is no showing, nor does it logically follow, how [the] use or nonuse of a degree relates to the facts or issues in this particular case." Id. at 684-85 (emphasis added).
Similarly, under Alabama's procedure, the proponent's explanationseven if facially neutralare not viewed by the judiciary with credulous naivete. In Alabama, "[t]he trial court cannot merely accept the specific reasons given by the prosecutor at face value.... Rather, the court must consider whether the facially neutral explanations are contrived to avoid admitting acts of group discrimination." Ex parte Thomas, 601 So.2d 56, 58 (Ala.1992).
In Thomas, the State challenged three black veniremembers on the sole basis of "information contained in [a] document to which only the State had access" during the defendant's Batson hearing, id. at 58, namely a document ostensibly showing that the challenged veniremembers "had a large number of misdemeanor convictions and/or bad driving records." Id. at 57. The State refused the defendant's request to submit the document for examination by the trial court or for entry on the record, and the trial court did not require the State to produce it. Id. at 58. This Court held that the refusal to order its production "erroneously denied Thomas an opportunity to prove that the seemingly facially neutral explanations offered by the State were a sham or pretext." Id.
Another example of specific, record-based scrutiny of the proponent's explanation is Millette v. O'Neal Steel, Inc., 613 So.2d 1225 (Ala.1992), in which O'Neal Steel, Inc. ("O'Neal"), attempted to justify two peremptory challenges on the ground that the veniremembers "did not appear" to be highly educated and a third challenge on the ground that during voir dire the veniremember had used two verbless sentences. Id. at 1229-30. O'Neal contended "that it was important to [its] case that the jurors be able to understand documents and their modifications." Id. at 1230.
Nevertheless, this Court concluded that the proffered explanations were not "adequate, facially race-neutral reasons." Id. A significant consideration in the Court's conclusion was the absence of evidence that O'Neal had evaluated the first two veniremembers' educational levels on anything but their current employment status. Similarly, the record demonstrated that the third veniremember was a "school teacher employed by the Jefferson County Board of Education." As to the third challenge, the Court essentially concluded that the proffered explanation was not supported by the record. See also K.S. v. Carr, 618 So.2d 707, 711 (Ala.1993) (standard was not satisfied where the "explanation given for striking one of the black veniremembers [was] factually inaccurate, based on that veniremember's testimony during voir dire"); Ex parte Yelder, 630 So.2d 107, 109 (Ala.1992) (standard was not satisfied where "the `articulation' or *180 `communication' difficulties cited by the State as reasons for its challenges of veniremember[s]... [were] not supported by the record").

B. Federal Rule
Even at the genesis of the contemporary era of peremptory challenge oversight, the extent of similarity between the standard declared in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and the standard adopted in Alabama was questionable. The focal point was the quantity and quality of explanation required of the proponent to rebut a prima facie case of discrimination. Specifically, Branch declared that an effective rebuttal required the proponent to "articulat[e] a clear, specific [emphasis added], and legitimate reason for the challenge which relates to the particular case to be tried [emphasis omitted]." 526 So.2d at 623.
Although Branch cited Batson for this proposition, the actual language in Batson is different. Batson merely stated: "The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried." 476 U.S. at 98, 106 S.Ct. at 1724 (emphasis added).[4] In a footnote at the end of this sentence, Batson stated: "As we explained in another context, ... the prosecutor must give a `clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges. Texas Dep't of Community Affairs v. Burdine, 450 U.S. [248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)]." 476 U.S. at 98, n. 20, 106 S.Ct. at 1724, n. 20. However, the standard articulated in the text accompanying footnote 20, and, especially, the standard in the footnote itself, were eroded in subsequent cases.
In Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), for example, the Supreme Court revisited Batson in the context of New York's challenges of Hispanic veniremembers in a criminal trial. Responding to the defendant's Batson objection, the prosecutor contended that he had struck the Spanish-speaking veniremembers because he "[felt] very uncertain that they would be able to listen and follow the [court's official] interpreter." 500 U.S. at 356, 111 S.Ct. at 1864. Although this explanation may have satisfied even the Alabama standard, the Court's analysis heralded a retreat from the standard declared in Batson. It stated:
"In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law....
"A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."
500 U.S. at 359-60, 111 S.Ct. at 1866 (emphasis added).[5]
Justice Stevens, in a dissent joined by Justice Marshall, criticized the majority on precisely the points of distinction between Batson and Branch. Specifically, he criticized the Court's conclusion "that a defendant's Batson challenge fails whenever the prosecutor advances a ... justification that is not facially discriminatory." 500 U.S. at 376, 111 S.Ct. at 1875 (Stevens, J., dissenting). He explained that "focusing the entire inquiry on the subjective state of mind of the prosecutor," id. at 378, 111 S.Ct. at 1876, "impose[s] on the defendant the added requirement that he generate evidence of the prosecutor's actual subjective intent to discriminate." Id.
The difference between the Alabama and federal standards was even more clearly evidenced in Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). In *181 the trial of a defendant charged with second-degree robbery, a Missouri prosecutor struck a black veniremember "because of his long hair." ___ U.S. at ___, 115 S.Ct. at 1770. The prosecution stated: "He had long curly hair. He had the longest hair of anybody on the panel by far. He appeared to not be a good juror for that fact, the length, curly, unkempt hair." Id.
The defendant was convicted after the trial court overruled his Batson objection and empaneled the jury. Id. "The Missouri Court of Appeals affirmed, finding that the `state's explanation constituted a legitimate "hunch"' and that `[t]he circumstances fail[ed] to raise the necessary inference of racial discrimination.'" ___ U.S. at ___, 115 S.Ct. at 1770. The defendant unsuccessfully sought habeas corpus relief in the United States District Court. However, the Court of Appeals for the Eighth Circuit reversed, holding that the explanation "`was pretextual,' and that the state trial court had `clearly erred' in finding" no "intentional discrimination." Id.
The United States Supreme Court reversed that judgment. According to the per curiam opinion, the second step of the federal peremptory challenge framework, namely, the proponent's burden of rebutting a prima facie case of discrimination, "does not demand an explanation that is persuasive, or even plausible." ___ U.S. at ___, 115 S.Ct. at 1771 (emphasis in original). The Court cited with peculiar disapproval Batson's footnote 20 containing the terms "clear" and "specific," stating: "The Court of Appeals appears to have seized on our admonition in Batson that to rebut a prima facie case, the proponent of a strike `must give a "clear and reasonably specific" explanation of his "legitimate reasons"' for exercising the challenges....'" ___ U.S. at ___, 115 S.Ct. at 1771 (emphasis added). The Court concluded that "[t]he prosecutor's proffered explanation in [that] casethat he struck [the veniremember] because he had long, unkempt hair, a mustache, and a beard[was] race-neutral and satisfie[d] the prosecution's step 2 burden of articulating a nondiscriminatory reason for the strike." Id.
Criticizing the per curiam opinion in a dissent joined by Justice Breyer, Justice Stevens stated: "Today, ... the Court replaces the Batson standard with the surprising announcement that any neutral explanation, no matter how `implausible or fantastic,' ... even if it is `silly or superstitious,' ... is sufficient to rebut a prima facie case of discrimination." ___ U.S. at ___, 115 S.Ct. at 1774 (Stevens, J., dissenting). The dissent also addressed the opinion's pointed disparagement of the requirement cited with approval in the Batson footnote, stating:
"In my opinion, it is disrespectful to the conscientious judges on the Court of Appeals who faithfully applied an unambiguous standard articulated in one of our opinions to say that they appear `to have seized on our admonition in Batson, ... that the reason must be "related to the particular case to be tried...."' Of course, they `seized on' that point because we told them to. The Court of Appeals was following Batson's clear mandate. To criticize those judges for doing their jobs is singularly inappropriate.
"The Court of Appeals for the Eighth Circuit is not the only court to have taken our admonition in Batson seriously. Numerous courts have acted on the assumption that we meant what we said when we required the prosecutor's neutral explanation to be `related to the particular case to be tried.'"
___ U.S. at ___ n.8, 115 S.Ct. at 1773-74 n.8 (Stevens, J., dissenting).
I agree with Justice Stevens's dissent as to the effect of the Purkett's express disapproval of the "clear" and "specific" language of Batson's footnote 20 and the requirement in its accompanying text that the explanation relate to the case at hand. The effect is to increase substantially the opponent's burden of proving discrimination by requiring proof of the proponent's "actual subjective intent to discriminate." Hernandez, 500 U.S. at 378, 111 S.Ct. at 1876 (Stevens, J., dissenting). Certainly, it "replace[d] the Batson standard." Purkett, ___ U.S. at ___, 115 S.Ct. at 1771 (Stevens, J., dissenting). Thus, the question whether the standard set forth in Branch differed in any material respect from the standard set forth in Batson is moot. Hernandez and Purkett abrogated whatever *182 positive correlation may have existed between the federal standard as first declared and the standard adopted in Branch.
More significantly, because Alabama still places upon the proponent of the strike "the burden of articulating a clear, specific, and legitimate reason for the challenge that relates to the particular case to be tried," Millette v. O'Neal Steel, Inc., 613 So.2d 1225, 1229 (Ala.1992) (emphasis added), the Alabama peremptory challenge framework now differs substantively and substantially from the federal rule. This burden, which forms the essence of Alabama's peremptory challenge framework, exceeds the federal standard.[6] The Alabama standard, which does not center on the proponent's subjective intent, discounts "whimsical, ad hoc excuses." Ex parte Yelder, 630 So.2d 107, 109 (Ala. 1992); contra, Purkett, ___ U.S. at ___, 115 S.Ct. at 1771. Instead, it supplies the judiciary with testable, objective criteria, Ex parte Bankhead, 625 So.2d 1146, 1148 (Ala. 1993), with which to assess the constitutionality of the strike. Moreover, unlike the federal standard, the Alabama standard does not allow courts to "assum[e] the proffered reasons for the peremptory challenges are true." Hernandez, 500 U.S. at 359, 111 S.Ct. at 1866.
In summary, therefore, I disagree with Justice Maddox on both positions he takes in his special concurrence. First, Alabama's peremptory challenge framework is not based on Batson and its federal progeny, but on adequate and independent state law.[7] Second, Alabama's standard differs considerably from the one set forth in Purkett.
I do, however, agree with Justice Maddox's point that many of the problems that arise with regard to the striking of jurors can be minimized by using questionnaires and by restricting the number of peremptory strikes. The number of strikes could be restricted by limiting the size of the venire from which the jury is selected.
MADDOX, Justice (concurring in the result).
I concur only in the result of the majority's decision to quash the writ. However in view of the fact that the majority states that "[i]n quashing the writ, however, we point out that this Court disapproves of the reliance of the Court of Civil Appeals on Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), and Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)," and that "[t]hose federal cases do not control Alabama's peremptory challenge procedure, which is based on adequate and independent state law," I must file this special concurrence.
The majority's statement shows that there is still disagreement about the law as it relates to peremptory challenges in Alabama, and it suggests that Alabama has an established independent state law ground that governs the use of peremptory challenges in Alabama. I believe this statement will only add to the confusion that already exists in this area of the law.
The law of Alabama relating to peremptory strikes before Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was stated in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Under Swain, a party could exercise a peremptory challenge for a good reason, a bad reason, or for no reason at all, and, thus, could strike jurors because of their race, color, religion, sex, national origin, economic status, or eye color. The decisions of this Court in Ex parte Jackson, 516 So.2d 768 (Ala.1986), and Ex parte Branch, 526 So.2d 609 (Ala.1987), both cite Batson as the authority for changing the Swain rule.
As the author of Branch, I believe I know what that opinion holds, and in many cases decided after Branch I have had to defend against allegations that Batson and its progeny, for all intents and purposes, destroyed peremptory challenges. I write specially, and at length, to state why the rule governing peremptory challenges in Alabama, as *183 expressed by both statute and case law, is the same as the rule stated in Batson and its progeny, which is the basis for the federal rule. I also take this opportunity to state and suggest once again how judges and lawyers could eliminate many of the problems that have arisen in applying the principles of law relating to the exercise of peremptory challenges.
I first address the proposition that "Alabama's peremptory challenge procedure ... is based on adequate and independent state law," and the majority's suggestion that Branch, its progeny, and Alabama's statute impose a stricter standard for reviewing the exercise of peremptory challenges than does Hernandez and Purkett. The United States Supreme Court recently, in Pennsylvania v. Labron, ___ U.S. ___, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996), addressed a similar issue relating to the question whether there was an independent state ground for deciding a question. In reversing two decisions of the Supreme Court of Pennsylvania, the Court said: "[T]he Supreme Court of Pennsylvania held that the Fourth Amendment, as applied to the States through the Fourteenth, requires police to obtain a warrant before searching an automobile unless exigent circumstances are present." ___ U.S. at ___, 116 S.Ct. at 2486. The defendant argued that the requirement of a warrant for the search was based on an "adequate and independent state ground, viz., `this Commonwealth's jurisprudence of the automobile exception.'" ___ U.S. at ___, 116 S.Ct. at 2487. The United States Supreme Court disagreed. It wrote:
"We disagree. The language we have quoted is not a `plain statement' sufficient to tell us `the federal cases [were] being used only for the purpose of guidance, and d[id] not themselves compel the result that the court ha[d] reached.' Michigan v. Long, 463 U.S. 1032, 1041 [103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201] (1983). The Pennsylvania Supreme Court did discuss several of its own decisions; as it noted, however, some of those cases relied on an analysis of our cases on the automobile exception, see, e.g., [Commonwealth v. Labron, 543 Pa. 86, 94-96, 669 A.2d 917, 921 (1995)] (observing Commonwealth v. Holzer, 480 Pa. 93, 103, 389 A.2d 101, 106 (1978), cited Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)); [543] Pa., at [100-02], 669 A.2d, at 924 (stating Commonwealth v. White, [543 Pa. 45, 669 A.2d 896 (1995)], rested in part upon the Pennsylvania Supreme Court's analysis of Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)). The law of the Commonwealth thus appears to us `interwoven with the federal law, and ... the adequacy and independence of any possible state law ground is not clear from the face of the opinion.' Michigan v. Long, 463 U.S., at 1040-1041 [103 S.Ct., at 3476]. Our jurisdiction in [this] case is secure. Ibid. The opinion in [the companion] case, meanwhile, rests on an explicit conclusion that the officers' conduct violated the Fourth Amendment; we have jurisdiction to review this judgment as well."
___ U.S. at ___, 116 S.Ct. at 2487.
A similar situation is presented here, although this case does not deal with search and seizure law. Insofar as I am aware, this Court has never attempted to create an independent and adequate state law ground for Batson-type challenges, but has merely attempted to apply the law as set forth by the United States Supreme Court. I am even more persuaded of the fact that the Alabama law of peremptory challenges does not rest upon an independent state law ground, but is consistent with the federal law as set out in Batson and its progeny. I reach this conclusion after reviewing the majority opinion in Ex parte Jackson, 516 So.2d 768 (Ala.1986), the first Alabama Supreme Court decision dealing with equal protection and peremptory strikes, and in which the majority cited and attempted to follow Batson.
In quashing the writ, the Court does not expressly accept the plaintiff's argument that this Court, in Ex parte Bird, 594 So.2d 676 (Ala.1991), and in Millette v. O'Neal Steel, Inc., 613 So.2d 1225 (Ala.1992), adopted a heightened standard regarding peremptory *184 strikes in Alabama,[8] but I think its statement made in quashing the writ will perpetuate the confusion surrounding this issue.
It seems clear to me from a reading of both Ex parte Jackson, a criminal case, and Millette, a civil case, that this Court was not attempting to establish an Alabama rule relating to peremptory challenges different from the federal rule established in Batson, but was deciding the issues of federal constitutional law that were raised in those two cases. Although I recognize that some state courts had adopted a procedure relating to peremptory challenges before Batson was decided, and that the Batson decision was based, in part, on some of those cases, Alabama was following the rule enunciated in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), when Batson was decided.
In Ex parte Jackson, this Court made reference to the fact that several state courts "[i]n the face of the harsh burden of Swain, had found that their state constitutions required a lesser burden on a defendant." As I read Jackson, the Court was deciding only an issue of federal constitutional law, and did not decide that there were independent state grounds for finding the existing procedure unconstitutional. This is apparent from the Court's opinion. The Court said:
"The most compelling of the issues raised by Jackson is whether his equal protection rights were violated when the prosecution used its peremptory challenges to strike all ten of the prospective black jurors from the venire. The United States Supreme Court's decision in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), changed a defendant's burden of proof on the issue of the prosecution's using peremptory challenges to systematically exclude blacks from serving on the jury. The much more stringent burden of Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), was in effect at the time of defendant's trial, and the issue before us is whether a rule similar to the rule announced in Batson should be applied to this defendant's trial. We hold that a rule like the rule which the United States Supreme Court announced in Batson v. Kentucky, supra (that `a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial,' 476 U.S. at 96-97, 106 S.Ct. at 1722-23), is to be applied to Jackson's trial."
516 So.2d at 770. There is no doubt that this Court was deciding the federal constitutional issue presented in Jackson and was not holding that there were independent state grounds for establishing a new procedure.
Likewise, in Millette, this Court specifically stated that it was addressing a federal constitutional question:
"We now turn to the issue of whether O'Neal's use of its peremptory strikes to eliminate black veniremembers violated the prohibitions of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and Thomas v. Diversified Contractors, Inc., 551 So.2d 343 (Ala.1989). In Thomas, this Court adopted both the reasoning and the result in Fludd v. Dykes, 863 F.2d 822, reh'g denied, 873 F.2d 300 (11th Cir.1989), cert. denied, 493 U.S. 872, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989), and held that the Batson principle was applicable in both criminal and civil cases. 551 So.2d at 345. See also, Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the United States Supreme Court held that white litigants, as well as black litigants, have standing to challenge the discriminatory exclusion of blacks from the jury venire.
"The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). After *185 a prima facie case has been established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Ex parte Branch, 526 So.2d at 623. The responding party then has the burden of articulating a clear, specific, and legitimate reason for the challenge that relates to the particular case to be tried and that is nondiscriminatory. Ex parte Bird, 594 So.2d 676, 679 (Ala.1991), quoting Batson, 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. Once the responding party has articulated a nondiscriminatory reason or explanation for challenging the black jurors, the defendant can offer evidence showing that the reason or explanation is merely a sham or a pretext. Ex parte Branch, 526 So.2d at 624. When the trial court has followed this procedure, its determination will be overturned only if that determination is clearly erroneous. Ex parte Branch, 526 So.2d at 625."
613 So.2d at 1229.
Based on the foregoing, it seems clear that Ex parte Jackson and Branch applied Batson to Alabama cases and did not require anything different from what Batson required. The United States Supreme Court cases decided after Batson merely refined what Batson had said initially. It seems that this Court, in Bird and Millette, was merely attempting to follow the Batson standard set forth by the United States Supreme Court and was not attempting to develop a rule based on independent state law grounds. The language found in both Bird and Millette stating that the proponent of a strike must give a "`clear and reasonably specific' explanation of his `legitimate reasons' for exercising the challenges," and that the reason must be "related to the particular case to be tried," was derived from Branch, which in turn was based on Batson. In view of this fact, how could it be said that this Court intended Alabama's rule to be different from the rule in Batson? And how could it be different from that set out in Purkett, supra, which did not change the Batson standard, but merely clarified it.[9]
My belief that the United States Supreme Court, in Purkett, did not change the Batson requirements is based on the Court's statements in Purkett and also in Hernandez, supra. In Purkett, the Court suggested that the lower court had "seized upon an admonition" in Batson and had misconstrued it. The Court, in Purkett, said:
"The Court of Appeals appears to have seized on our admonition in Batson that to rebut a prima facie case, the proponent of a strike `must give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges,' Batson, 476 U.S., at 98, n. 20, 106 S.Ct., at 1724, n. 20 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)), and that the reason must be `related to the particular case to be tried,' 476 U.S., at 98, 106 S.Ct., at 1724. See [Elem v. Purkett], 25 F.3d, [679] at 682, 683 [(8th Cir.1994)]. This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What it means by a `legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection. See Hernandez, supra, at 359, 111 S.Ct., at 1866; cf. Burdine, supra, at 255, 101 S.Ct., at 1094 (`The explanation provided must be legally sufficient to justify a judgment for the defendant')."
___ U.S. at ___, 115 S.Ct. at 1771. A reading of Purkett shows that some judges and lawyers in Purkett were doing what the plaintiffs seek to get this Court to do in this case, seize upon an admonition or "warning" in Batson, and, in turn, blow it out of proportion.
As the author of Branch, and having had the opportunity to review many appeals in which Batson and Branch challenges were *186 made, I have always thought that many in the legal community were misreading the requirements of those two cases, and I welcomed the decision in Purkett, believing that it further clarified what I had thought the Court had initially said in Batson. In my opinion, many were misreading Batson by not extending the principles to peremptory strikes by defendants and to gender-based strikes, and I expressed my beliefs in opinions, some of them dissenting opinions.
Based on a great deal of research, it is my opinion that the underlying purpose of Batson was to prevent persons from being struck "solely" (the word used by the Supreme Court in Batson), because of their race or gender, by either side. I take this opportunity, using excerpts from some articles and papers I have written on Batson,[10] to state why I have never thought Purkett changed the law. I further suggest corrective action that judges and lawyers could take to help eliminate, or at least substantially reduce, the number of Batson issues.[11]
Undeniably, when the Supreme Court of the United States decided Batson, and when this Court decided Branch, the continued viability of the peremptory challenge was questioned. Further, it cannot be denied that attempts at applying the principles of Batson have caused, and continue to cause, judges, prosecutors, defense lawyers, and parties in civil cases, a multiplicity of problems, and that as a result, Batson issues are frequently raised on appeals in both criminal and civil cases.
Why has Batson caused judges and lawyers so much difficulty and why do members of the Supreme Court of the United States still disagree on what Batson said? It is probably because Batson turned the traditional *187 method of striking jurors based on stereotypes completely on its ear. An article by Kent Scheidegger, entitled "Excuses, Excuses," ABA Journal, p. 20 (Feb.1996), shows why the Batson rule has never been accepted. Scheidegger stated:
"The peremptory challenge historically has been [based on] gut feel.... If the prosecution can't challenge a person who looks like he just came from a Grateful Dead concert, and the defense can't challenge someone who looks like a straitlaced Marine, then there is no peremptory challenge."
In my opinion, the main problem arising from the application of Batson is the fact that many lawyers and judges still long to do as they used to do, i.e., use their preemptory challenges to strike jurors based on stereotypes or "gut feelings" based on impermissible stereotypes.[12] The only way a defendant could establish a prima facie case of discrimination under Swain, supra, was to prove systematic discrimination on the part of the prosecutor.
Batson made at least three significant changes in the law as it related to the striking of jurors. First, it clearly overruled the principle set out in Swain that required a defendant to prove systematic discrimination in order to establish a prima facie case of a violation of his or her rights under the Equal Protection Clause of the United States Constitution. Second, the opinion set forth a principle that provided potential jurors with individual rights not to be discriminated against on account of their race. Third, it concentrated on the integrity of the jury system itself by not allowing a party to remove a juror "solely" because that juror was black or white, male or female, etc.
The Batson holding, in my opinion, is summed up by this statement from Batson:
"Accordingly, the component of the jury selection process at issue here, the State's privilege to strike individual jurors through peremptory challenges, is subject to the commands of the Equal Protection Clause. Although a prosecutor ordinarily is entitled to exercise permitted peremptory challenges `for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried, United States v. Robinson, 421 F.Supp. 467, 473 (Conn.1976), mandamus granted sub nom. United States v. Newman, 549 F.2d 240 (C.A.2 1977), the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."
476 U.S. at 89, 106 S.Ct., at 1719 (emphasis added) (footnote omitted). Although Batson completely changed the law relating to this kind of "gut feeling" peremptory strike, Purkett does not walk away from this basic premise, which lies at the heart of Batson.[13]
*188 The frustration with Batson probably resulted from what, as I mentioned earlier, appeared to be one of the basic foundation stones of the Batson decision: the right of citizens to serve on a jury and not be excluded solely for a reason unrelated to the case to be tried, so that the public's confidence in the integrity of the jury system would be preserved, a goal established by the Court in Batson.
Batson accomplished both goals. It prohibited stereotyping of prospective jurors because of race or gender, and it went a long way in restoring public confidence in the jury system. Also, Batson was consistent with the public policy of this State and of those jurisdictions that have adopted the Uniform Jury Selection and Service Act, § 12-16-55 et seq., which gives all citizens an opportunity to serve as jurors and not to be excluded solely because of their race, color, creed, gender, or religion. This concept was first advanced in Batson, and was further written to in Georgia v. McCollum, 505 U.S. at 48-49, 112 S.Ct. at 2353-54. In McCollum, the Court concluded that the State had standing to challenge discriminatory strikes by the defense on behalf of the wronged jurors. 505 U.S. at 55-56, 112 S.Ct. at 2356-57. The McCollum Court further emphasized that Batson prohibits the striking of jurors based on "the race of the juror or the racial stereotypes held by the party." 505 U.S. at 59, 112 S.Ct. at 2359. (Emphasis added.)
McCollum seems to make clear what the Court had said initially in Batsonthat the use of peremptory strikes based on some perceived stereotype based on race or gender will not be permitted. In other words, Batson protects the right of a prospective juror not be excluded from jury service by "purposeful... discrimination," and that is all that Purkett says or suggests.[14]Purposeful discrimination means that a juror is struck because that juror has some characteristic, such as race or gender, that is unrelated to the particularities of the case to be tried. "Purposeful discrimination" would destroy the integrity of the judicial system, because it would suggest that a juror, "solely" because of race or gender, for example, would not be qualified to sit on a jury.
The holding in Batson does parallel the public policy of Alabama as expressed in §§ 12-16-55 and 12-16-56, Ala.Code 1975. Section 12-16-55 provides:
"It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity, in accordance with this article, to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose."
Section 12-16-56 provides:
"A citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin or economic status."
Branch sets out much of the history of drawing, summoning, selecting, and empaneling juries in Alabama, and, in a footnote, specifically set out the history of peremptory challenges in criminal cases. 526 So.2d at 617. Because this Court mentioned in *189 Branch the public policy of the state, as quoted above, and because it set forth specific guidelines for applying Batson, some may have thought that Alabama set a higher standard than is now set in Purkett, but any suggestion of a higher Alabama standard is based on a bad premise, because, as I stated earlier, Purkett merely further explains Batson it does not change the holding.
A close reading of §§ 12-16-55 and 12-16-56 shows that the State's policy regarding the opportunity of jurors to serve without regard to "race, color, religion, sex, national origin, or economic status" is not unlike the requirements in Batson. In fact, they are complementary to Batson, and merely complementary. They do not create a higher standard. Before the adoption of this public policy relating to jury service by the Legislature in 1978, the jury selection procedures in several Alabama counties had been challenged in legal proceedings, and practitioners can verify that the jury rolls in many counties would not have reflected the policy set forth by the Legislature.[15] During the late 1970's and early 1980's, the Administrative Office of Courts took specific steps to improve juror management in Alabama and developed specific procedures so that each Alabama county would have its jury lists computer-drawn from a master list compiled primarily from driver's license lists for the county.
Branch provides the basic roadmap for making and preserving a Batson challenge. Branch established the principle that the initial burden is on the party challenging the use of a peremptory challenge to make a prima facie showing that the challenge was used to discriminate against a particular juror solely because of race. Until this prima facie showing is made, there is no requirement on the other party to respond.[16] In Branch, the Court listed examples of conduct that could raise an inference of discrimination and said that the trial court, in determining whether a prima facie showing had been made, should consider all of the circumstances. If a prima facie showing of discrimination is made, then the other party has the burden of articulating a clear, specific, and legitimate reason for the challenge; that challenge must relate to the particular case to be tried and must be nondiscriminatory.
This showing need not, of course, rise to the level of a challenge for cause. In Branch, the Court provided examples of reasons that could be considered legitimate and nondiscriminatory, and it specifically stated, "The trial court, in exercising the duties imposed upon it, must give effect to the state policy expressed in Sections 1, 6, and 22 of the Alabama Constitution and Code 1975, § 12-16-55 and § 12-16-56." 526 So.2d at 624. (Emphasis in original.) The Court further said:
"[T]he trial judge must make a sincere and reasonable effort to evaluate the evidence and explanations based on the circumstances as he knows them, his knowledge of trial techniques, and his observation of the manner in which the prosecutor examined the venire and the challenged jurors."
Id.
Judges and lawyers can eliminate some of the problems created by Batson as now defined further by Purkett. One of the many problems with juror strikes based on racial or gender stereotypes is that a particular juror will not fit the stereotypical mold, so that if the strike is challenged, it would be difficult for the proponent to articulate a clear, specific, and legitimate reason for the exercise of the strike. I have presented the Batson principles to lawyers and judges at several continuing legal education seminars, and at those seminars I have used the following illustration. Juror A is a 28-year-old female; she is single and a graduate of Auburn University at Montgomery; she likes to watch the television legal drama Matlock; and she works for the State as a data processor. Is she black, white, Hispanic, or Asian? Does it matter in regard to the particular case to be tried? Juror B is a 38-year-old teacher of high school biology, who *190 has teenaged children, and who is married and has never been divorced. Is the juror male or female, black or white? Does it matter in the case to be tried? The key is to select jurors based on the particulars of the case to be tried.
Clearly, lawyers can still have general profiles of the type of juror that they would prefer for particular cases. The jurors just cannot be "purposefully discriminated" against based "solely" on account of their race or gender. The burden, of course, remains on the opponent of the strike to make a prima facie showing that the other side has violated this principle.
Although I believe Batson problems will subside in the trial courts, I want to state once again what I stated in Huntley v. State, 627 So.2d 1013, 1017-18 (Ala.1992), in a special concurrence, with the hope that it might help prevent Batson-generated problems:
"I have always thought that many Batson problems could be eliminated in both criminal and civil cases by the following procedure:
"(1) Requiring prospective jurors, when they are summoned to appear or when they assemble, to fill out a written questionnaire that would provide substantial background information to the parties to use in exercising their peremptory strikes. In addition to a general questionnaire, the parties might have specific questions, because of the particular nature of the case to be tried, that they would want prospective jurors to answer.
"(2) Limiting the number of peremptory strikes available by limiting the size of the venire from which the parties begin striking. In a majority of civil and criminal cases, the rules of procedure only require 24 qualified jurors to be on the panel when the parties begin to exercise their peremptory challenges.
"(3) Adopting the rule used in Federal courts that prohibits so-called `back striking'; that is, placing 12 qualified prospective jurors in the jury box, and having the parties decide how many of those 12 they separately and severally want to strike. If a prospective juror was not removed from the box by either side, that juror could not be removed later."
627 So.2d at 1017-18 (footnote omitted). I further suggested the use of a questionnaire similar to the one used in Montgomery County:
"Because the Batson rule now applies to strikes exercised by criminal defendants, and because I believe that it will soon apply to gender-based strikes, I think trial judges should consider permitting prospective jurors to fill out a questionnaire that would contain information helpful to the parties in exercising peremptory challenges without regard to a prospective juror's race or gender. Such a procedure would greatly assist the trial court in determining whether a party has made a prima facie case of discrimination and whether any reasons offered in support of the strikes were in fact race neutral. Furthermore, the procedure would greatly assist appellate courts in reviewing challenges made by either side.
"Batson and Branch basically prohibit stereotypical strikes. Parties should ask themselves when exercising their peremptory challenges, `Why am I striking this particular person?' If it is because of race, which I think will later be extended to gender, then it violates the Batson rule."
627 So.2d at 1018. The use of a questionnaire, commonly referred to as "paper voir dire," could effectively ferret out individual potential jurors who might not be desirable for the particular case to be tried. Properly designed questionnaires might disclose hidden prejudices that the juror might not even suspect he or she has. For example, some questionnaires can reportedly determine whether a particular juror might be prosecutionor defenseoriented.
The Alabama Administrative Office of Courts and the Alabama Law Institute are working on the possibility of this Court's adopting a general questionnaire that could be used in every county, but that has not been done yet. I attach a copy of a questionnaire that I have drafted which is based on several questionnaires that have been used in *191 some Alabama circuit courts and in other state and federal courts. Appendix A. Individual questionnaires, of course, in addition to a generic questionnaire, could be prepared for individual cases, so that the parties could obtain information about the jurors relating to the particular case to be tried.
It should be remembered that in Batson the Supreme Court vested with trial courts much discretion in determining whether one party has made a prima facie showing that the opposing party had engaged in "purposeful discrimination," and also whether, in those cases where neutral reasons for a strike were required, whether the reasons given were a mere pretext for purposeful discrimination.
In conclusion, let me say that Batson and its progeny do prohibit most "stereotyping" and "gut feelings" in the exercise of peremptory strikes involving protected classes. Batson's admonition to trial attorneys was: Do not be involved in "purposeful discrimination," use voir dire to individualize the jurors as much as possible, and move from the traditional thought patterns that identified individual jurors as possessing the purported stereotypical characteristics of a class of which he or she is a member.
In short, relegate this type of "gut feel" striking of jurors to the pages of history. Let it take its place alongside the quill pen, pleading in Latin, and legal-size paper. Apply instead the policy of the Uniform Jury Selection and Service Act, which is the model act after which both the Federal law and the Alabama law regulating the selection of juries are based. The underlying policy of the Uniform Jury Selection and Service Act is "that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens have the opportunity ... to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose," and that "[a] citizen shall not be excluded from jury service in this state on account of race, color, religion, sex, national origin or economic status." Sections 12-16-55 and -56, Ala.Code 1975.
HOOPER, C.J., concurs.
 JUROR QUESTIONNAIRE
 This questionnaire is for use only by the judge and lawyers in selecting a jury. It is not public
 information. If you need additional space to answer a question, attach additional sheets and
 number your answers to correspond to the questions.
1. Juror number: ______________________________________________________________________________
2. Place of birth: _______________ Age _____
3. Race: () Caucasian/White () African"American/Black () Hispanic () Other
4. Sex: () Male () Female
5. Do you: () Own home () Rent home () Rent apartment () Live with friend or relatives () Other
6. Where have you lived during the past five years? ___________________________________________
7. Marital status: () Single () Married () Divorced () Separated () Widowed
8. If you are/were married:
 Spouse's employer: _________________________________________________________________________
 How long has your spouse worked there? _____________________________________________________
 Spouse's title and job responsibilities: ___________________________________________________
 Educational background of your spouse, including any degrees or certificates earned:
 ____________________________________________________________________________________________
*192
9. If you have children, complete the following:
 Age Sex School or occupation Live with you? Their level of education?
 ___ ___ _________________________________________________________________________________
 ___ ___ _________________________________________________________________________________
 ___ ___ _________________________________________________________________________________
 ___ ___ _________________________________________________________________________________
10. Your level of education:
 (a) If college, what college, what degrees, and your major? ____________________________
 ____________________________________________________________________________________
 (b) Have you ever taken any courses in law, law enforcement, criminology, or criminal
 justice?__________ If yes, what courses? ___________________________________________
11. Your present employment status (check all that apply):
 () full-time () part-time () retired () unemployed () student () homemaker
12. Your current or most recent occupation: ___________________________________________________
13. Name of your current or most recent employer, or, if you are a student, your school:
 ___________________________________________________________________________________________
14. How long have you been employed by your current or most recent employer? __________________
15. What are/were your specific duties and responsibilities on the job?
 ___________________________________________________________________________________________
16. Do/Did you supervise any other employees? ______ How many? _____
17. Do/Did you have responsibility for hiring and firing? _____
18. Please list all other occupations and employers you have had for the past ten years:
 ___________________________________________________________________________________________
19. If you ever served in the military, please complete the following:
 Branch: _____________ Rank: ______________ Dates: __________
 Duties: ___________________________________________________________________________________
 Place of service: _______________ Type of discharge: _______________
20. What social, civic, professional, trade, union, or other organizations are you affiliated with?
 ___________________________________________________________________________________________
21. Describe any offices you have held in the organizations listed in question 20: ____________
22. Have you ever served on a jury before? _____ How many times? _____
 () Grand jury () Trial jury () Civil () Criminal
23. If you have served on a trial jury, please state the following:
 Year _____ City and State: ________________________________________________________________
 What verdict was rendered? Civil case: () For plaintiff () For defendant
 Criminal case: () For State or Federal Government () For defendant
24. Have you ever served as a foreperson on a grand jury or a trial jury? () Yes () No
25. Have you testified as a witness in any court proceeding? () Yes () No
 If yes: I was a witness for the () Plaintiff () State or Federal Government () Defendant in a civil
 or criminal case
26. Have you or a close relative ever sued or been sued in any type of lawsuit? If yes, explain:
 ___________________________________________________________________________________________
*193
27. Have you ever been to court for any other reason (excluding divorce or traffic cases)? If yes,
 explain:
 ___________________________________________________________________________________________
28. Have you ever been arrested? () Yes () No
29. Have you, a close relative, or close friend ever been convicted of a crime? () Yes () No
30. What newspaper(s) do you read regularly? __________________________________________________
31. What T.V. news programs do you watch frequently? __________________________________________
32. How many hours of T.V. do you watch per week? _____________________________________________
33. What radio programs do you listen to most? ________________________________________________
34. Which do you find more interesting? () Local news () National news
35. To what periodicals or magazines do you subscribe?
 ___________________________________________________________________________________________
36. Of the books you have read, which three are your favorites? _______________________________
 ___________________________________________________________________________________________
37. Please list your hobbies, spare time activities, and outside interests:
 ___________________________________________________________________________________________
38. Are there bumper stickers on the vehicles that you drive or that your spouse drives?
 () Yes () No If yes, what do they say? ____________________________________________________
39. In a group situation, once you have formed an opinion, do you usually:
 () Change your mind if a number of people have a different opinion?
 () Stand by your original opinion despite what others believe?
40. If you have relatives or close personal friends who are judges or attorneys or court personnel, what
 are their names and relationship to you?
 ___________________________________________________________________________________________
 ___________________________________________________________________________________________
41. Based on your experience, what is your opinion of lawyers? () Good () Fair () Poor
42. If there are any medical problems (for example problems with your vision or hearing), that may
 prevent you from serving as a juror, explain:
 ___________________________________________________________________________________________
 ___________________________________________________________________________________________
43. If you have any ethical, religious, political, or other beliefs that may prevent you from serving as a
 juror, explain: ___________________________________________________________________________
44. If there is any matter not covered by this questionnaire that could affect your ability to be a fair
 and impartial juror, explain: _____________________________________________________________
45. List any reason why you do not wish to serve or why you should not serve:
 ___________________________________________________________________________________________
 ANSWERS TO QUESTIONS 4649 ARE OPTIONAL
46. Do you belong to a church or otherwise have any religious affiliation?
 () Yes () No. If yes please specify: ______________________________________________________
47. How often do you attend religious services?
 () regularly () occasionally () never
48. Do you hold a special position in your religious organization? () Yes () No
49. What is your political party preference? __________________________________________________
*194 HOUSTON, Justice (concurring in the result).
I think this Court should affirm the judgment of the Court of Civil Appeals; nevertheless, I am content to quash the writ of certiorari, given that quashing the writ leaves the judgment of the Court of Civil Appeals in place. However, I disagree with what this Court has written in quashing the writ.
The United States Supreme Court in Purkett v. Elem, ___ U.S. ___, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), encouraged me to think that the peremptory challenge might survive. However, the majority of this Court today drives another nail into the coffin of the peremptory challenge in Alabama.
NOTES
[1] Under Swain, one opposing a peremptory strike on the basis of discrimination ordinarily could not prove the discrimination on the basis of the facts in the opponent's particular case. Batson, 476 U.S. at 92, 106 S.Ct. at 1720-21.
[2] This discussion, which comprised no less than two pages of text, served to underscore the statelaw underpinnings of the procedure Branch was developing.
[3] "The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination." Branch, 526 So.2d at 622.
[4] Conspicuously absent from the standard declared in the text of the Batson opinion were the words "clear" and "specific."
[5] The Court affirmed the judgment of the New York Court of Appeals, which had "[held] that the prosecutor had offered a legitimate basis for challenging the individuals in question and [had deferred] to the factual findings of the lower New York courts." 500 U.S. at 358, 111 S.Ct. at 1865.
[6] The strike upheld in Purkett would not have survived the Alabama test, because, among other things, the length of the veniremember's hair had nothing to do with the case under consideration.
[7] Consequently, Purkett did not, as the Court of Civil Appeals concluded, disturb the standard applied in Millette v. O'Neal Steel, Inc., 613 So.2d 1225 (Ala.1992).
[8] The plaintiffs point to language in those opinions requiring that the party exercising the challenged peremptory strike to "articulat[e] a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried," but, as I shall show later, those terms are lifted right out of Batson.
[9] I recognize, of course, that two Justices of the United States Supreme Court were of the opinion that Purkett did overrule portions of Batson, but they were dissenters. Justice Stevens, with whom Justice Breyer concurred, said: "In my opinion it is unwise for the Court to announce a law-changing decision without first ordering full briefing and argument on the merits of the case. The Court does this today when it overrules a portion of our opinion in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)." Purkett, ___ U.S. at ___, 115 S.Ct. at 1772.
[10] I have been asked on several occasions to give lectures before bench and bar groups on Batson-type issues, and I have also written on the subject. See, Hugh Maddox, Alabama Rules of Criminal Procedure, "The Effect of Batson v. Kentucky and Ex Parte Branch On Jury Selection in Criminal Cases," pp. 172-217 (Michie, 1995 Cum.Supp.); that section of my book contains a listing of many of the cases that address Batson-related issues; see, also, my article Batson: From an Appellate Judge's Viewpoint, 54 Ala. Law. 316 (1993), and my handout materials presented to the Alabama Trial Lawyers Association, January 27-29, 1994, entitled Batson: Quo Vadis?
[11] The following is a list of some selected articles about Batson:

1. Hugh Maddox, Batson: From an Appellate Judge's Viewpoint, 54 Ala. Law. 316 (1993).
2. S.J. Meltzer, United States v. Greer: Is a Racial Inquiry Necessary for an Adequate Voir Dire?, 67 Tul. L.Rev. 1700 (1993).
3. David Hittner and Eric J.R. Nichols, Jury Selection in Federal Civil Litigation: General Procedures, New Rules, and the Arrival of Batson, 23 Tex. Tech L.Rev. 407 (1992).
4. Michael A. Cressler, Powers v. Ohio: The Death Knell for the Peremptory Challenge?, 28 Idaho L.Rev. 349 (1992).
5. Steven M. Puiszis, Edmonson v. Leesville Concrete Co.: Will the Peremptory Challenge Survive its Battle with the Equal Protection Clause?, 25 J. Marshall L.Rev. 37 (1991).
6. Norbert L. Kerr, Geoffrey P. Kramer, John S. Carroll, and James J. Alfini, On the Effectiveness of Voir Dire in Criminal Cases with Prejudicial Pretrial Publicity: An Empirical Study, 40 Am. U.L.Rev. 665 (1991).
7. Reid Hastie, Is Attorney-Conducted Voir Dire an Effective Procedure for the Selection of Impartial Juries?, 40 Am. U.L.Rev. 703 (1991).
8. Bruce J. Winick, Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis, 81 Mich. L.Rev. 1 (1982).
9. Jury Questionnaire Helps Defense Counsel Weed Out Biased Jurors, 10 Inside Litig. 5 (October 1993).
10. Valerie P. Hans and Krista Sweigart, Jurors' Views of Civil Lawyers: Implications for Courtroom Communication, 68 Ind. L.J. 1297 (1993).
11. B. Michael Dann, "Learning Lessons" and "Speaking Rights": Creating Educated and Democratic Juries, 68 Ind. L.J. 1229 (1993).
12. Nancy J. King, Racial Jurymandering: Cancer or Cure? A Contemporary View of Affirmative Action in Jury Selection, 68 N.Y.U. L.Rev. 707 (1993).
13. Joseph D. Phelps, Batson: Challenges From the Perspective of a Trial JudgeSome Practical Considerations, 54 Ala. Law. 320 (1993).
14. Cathy E. Bennett, Robert B. Hirschhorn, and Heather R. Epstein, How to Conduct a Meaningful and Effective Voir Dire in Criminal Cases, 46 SMU L.Rev. 659 (1992).
15. G. Steven Henry, The Scope of Voir Dire in Civil Cases: An Alabama Perspective, 9 Am. J. Trial Advoc. 279 (1985).
16. James H. Gold, Voir Dire: Questioning Prospective Jurors on Their Willingness to Follow the Law, 60 Ind. L.J. 163 (1985).
17. Bonnie L. Mayfield, Batson and Groups Other Than Blacks: A Strict Scrutiny Analysis, 11 Am. J. Trial Advoc. 377 (1988).
18. Jere W. Morehead, Exploring the Frontiers of Batson v. Kentucky: Should the Safeguards of Equal Protection Extend to Gender?, 14 Am. J. Trial Advoc. 289 (1990).
[12] As an example of stereotyping by attorneys, I once heard of a theory alleging that brown-eyed people were emotional and that blue-eyed people were calculating. Using such stereotypes, lawyers tried to strike certain veniremembers, so as to leave in the jury a juror that they thought would be a "bell cow." A "bell cow" is a slang term for a leader, arising from the practice of cattle farmers placing a bell around the neck of the lead cow of the herd. See Webster's Third New International Dictionary (1981).
[13] Because Batson was a criminal case, involving a black defendant who had challenged the State's use of a peremptory strike to remove a black juror, many lawyers and judges may not have fully appreciated its scope at the time it was written, but there can be little doubt now that the principle set out in Batson is applicable in many other settings. For example, it is applicable to civil cases, like this one. Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); it is applicable to peremptory challenges by defendants in criminal cases, Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); to the prosecution's strikes of black jurors in a criminal case involving a white defendant, Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); and to gender-based strikes, J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Prior to the United States Supreme Court's decision in J.E. B., this Court was split on the issue whether Batson applied to gender-based strikes. A majority of this Court was of the opinion that Batson did not apply to gender-based strikes, but there were strong dissents. See Fisher v. State, 587 So.2d 1027 (Ala. Cr.App.1991), cert. denied, 587 So.2d 1039 (Ala. 1991) (Maddox, J., dissenting), cert. denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992); Dysart v. State, 581 So.2d 541 (Ala.Cr. App.), cert. denied, 581 So.2d 545 (Ala.1991) (Maddox, J., dissenting, joined by Adams, J.). For other Alabama cases in which the issue of gender-based strikes was discussed, see Ex parte Bankhead, 625 So.2d 1146 (Ala.1993); Huntley v. State, 627 So.2d 1013 (Ala.1992); Williams v. State, 607 So.2d 321 (Ala.Cr.App.1992) (Montiel, J., dissenting); Ex parte Murphy, 596 So.2d 45 (Ala.1992) (Maddox, J., dissenting); Mims v. State, 591 So.2d 120 (Ala.Cr.App.1991); and Stariks v. State, 572 So.2d 1301 (Ala.Cr.App. 1990).
[14] In Purkett, the Court said:

"Under our Batson jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful racial discrimination. Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1865-1866, 114 L.Ed.2d 395 (1991) (plurality opinion); id., at 375, 111 S.Ct., at 1874 (O'CONNOR, J., concurring in judgment); Batson, supra, at 96-98, 106 S.Ct., at 1722-1723."
___ U.S. at ___-___, 115 S.Ct. at 1770-71. (Emphasis added.) It would appear that the words "purposeful discrimination" are the equivalent of the words "solely on account of" that appeared in Batson and that were discussed in that opinion.
[15] For a list of the counties where actions had been filed, see Ex parte Branch, 526 So.2d 609, 618 n. 3 (Ala.1987).
[16] Now, the Batson principle has been extended to include strikes based on gender. See J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).